## LANGLEY v. STATE.

No. A-11037. Jan. 11, 1950.

(213 P. 2d 886.)

312

 

Jack Spivey and Wade Arends, Oklahoma City, A. L. Commons, Miami, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The defendant, John Langley, was charged by information with the crime of the murder of Fred Eby by shooting him with a .45 automatic pistol, in Quapaw, Ottawa county, Okla., on March 31, 1947. The information alleged that as a result of the shooting, Fred Eby suffered mortal wounds in the upper rear portion of his right shoulder and left side of his neck, from which wounds he lingered and died on April 21, 1947. The defendant was tried and convicted by a jury and his punishment fixed at 25 years in the penitentiary, and judgment and sentence pronounced accordingly.

The defendant's motion for new trial and petition in error sets up numerous assignments of error, but the record discloses all of them to be highly technical and without substance save those covered in defendant's proposition No. 2. Proposition No. 2 relates to his contention that the court erred in admitting in evidence state's demonstrative photographs Exhibits 3, 11, and 12. In State's Exhibit No. 3, Ben Eby, a brother of the deceased, appears pointing towards the ground at the southeast corner of the house where the record shows the deceased Fred Eby fell in his flight from the scene of the crime. Exhibits Nos. 11 and 12 are photographs in which the sheriff and the special prosecutor appear pointing toward certain bullet holes in the north wall of the kitchen, above

and to the right of the east door of the kitchen wherein the shooting took place. In these exhibits there is a steel poker pushed into the most westwardly hole in the wall. The sheriff and prosecutor, respectively, in Exhibit No. 11, appear, pointing toward the poker and to the hole protruding from the most westwardly hole, and to the eastwardly hole to the right and over the east door of the kitchen. In Exhibit No. 12 presumably the special prosecutor's arm can be seen pointing toward the eastwardly hole in the wall from which the poker is protruding. In each the object of the poker and the pointing was to demonstrate the state's theory as to how the holes got there. It being the state's purpose to show, from the angle in which they entered the wall, the position and place from which they were shot, that they were not shot therein at the time and place as testified to by the defendant, but at a time subsequent to the crime, for the purpose of defense at the time of trial. The defendant contends the admission of these exhibits was erroneous and highly prejudicial. In this connection he relies upon the case of Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111, hereinafter referred to.

In order to fully understand the issue herein raised, it is necessary we resort to a brief resume of the theory of the prosecution and the defense as revealed by the evidence of both. The state's theory was that the defendant suspected Ben Eby of having relations with his wife Willie Langley. The record discloses that he made accusations to Ben Eby concerning the same. Probably as an outgrowth of this feeling the defendant and his wife had been divorced only two or three days before the shooting. A few hours before the shooting the defendant came to Henry Eby's beer joint and there he saw his wife drinking with the Eby boys and other par-

ties. He observed Ben Eby throw his arms around Mrs. Langley in a caressing attitude. The record further shows that John Langley and his wife, Willie Langley, had been running a beer joint in the front part of their place and that they lived in the back rooms. When the divorce was granted it appears that Willie Langley moved the license from the place, and thus stopped the sale of beer by her former husband. John Langley took the residue of beer he had on hand and turned it over to a man by the name of White at another establishment. No doubt Langley was incensed by the action of his wife in taking away the beer license, as well as what he believed to be the relation between Ben Eby and her and concerning which he had talked to Ben Eby. The defendant, the day and night before the killing, had indulged in some drinking though the record does not disclose at the time of the crime he was drunk. It appears that the defendant was seen near the back door of Henry Eby's beer establishment with his .45 automatic pistol and that at that time he made a threat against the life of Ben Eby and his former wife, Willie Langley. The sheriff was called and after awhile the defendant left the establishment. Here, the scene changed and the defendant went to other places in his truck accompanied by other persons. Brooks Rogers was in the party, and they went to the beer establishment (or Green Place), formerly run by John and Willie Langley. When Willie moved out after the divorce her clothes were moved to one of the cabins behind this place. It was suggested, apparently by Rogers, that they throw through the window of the cabin some beer bottles they had. The state's evidence discloses this suggestion amplified the defendant's hitherto belligerent mood. The record shows the defendant drew his .45 gun on Rogers and threatened to kill him, stating he wanted to kill somebody any way, and he would

like to see his brains splattered out there. One of the men, Charley Wren, tried to leave when this occurred, and it appears that the defendant forced him at pistol point not to do so, but got in the truck and to drive until the truck stalled, and then Langley took the wheel. All this the defendant in substance denied. The evidence further shows that Henry Eby closed his beer establishment about 12 o'clock and Fred and Ben Eby went to Picher. About 3:30 a.m. on March 21, 1947, they returned to Quapaw, and went to the back door of the place where John Langley and Willie Langley had run the beer joint and made their home. The record shows they thought John Langley was at that time staying at his farm home. They did not expect him to be there. The record shows Fred Eby wanted to get a bottle of beer. He knocked on the back door and said "Willie, it is Ben and Fred. Get up. We want a bottle of beer." The back door was pushed open and John Langley, who it appears from the state's case was lying in wait, opened fire on Ben and Fred Eby. Fred was shot and fell. Empty .45 shells were found on the ground outside the door. Ben Eby ran about 20 yards, stopped and heard the defendant calling trying to wake up two women, Janie Flippins and his former wife, Willie Langley. The record discloses that from the dying declaration of Fred Eby as to the affair, he fell and pulled himself up on some rocks near the side of the house. The next day blood was observed on these rocks at the southeast corner of the house. These are the rocks heretofore referred to and pictured in Exhibit No. 3. The state's case further tended to show the Ebys were not armed and that Ben Eby had never owned a pistol, but did have a .22 rifle. The sheriff came to the premises about 6 a. m., on the morning of the shooting, and found no bullet holes in the kitchen where the shooting occurred. He returned again about 9:30 a. m.,

the same day, and he said he found none. About three weeks after, he returned and found two bullet holes, one in the north wall and one over the door in the east end of the kitchen, which he testified would have to have been fired from the position and angle he was standing and the prosecutor was standing, with the gun held in the manner they were pointing, as reflected in photographic Exhibits 11 and 12, taken on October 18, 1947. By this evidence the state sought to leave the impression that the defendant or someone else had shot the bullet holes in the wall at a later time than the shooting herein involved, as a predicate for the defendant's defense.

The defendant's evidence in effect was that he was in his home alone asleep. He testified he was awakened by the sound of someone at his screen window attempting to get in. He looked out of his unlighted room and saw two men. They went to the back door. One of them said "knock the door open, and let's go in and kill the son of a bitch". That was the door of the kitchen. The defendant said that he was standing in the middle door between the kitchen and the southeast bedroom. He said the men broke the door in. When the door was broken in, he hollered and fired two shots right up in the corner over the door. One of the men fell on the floor, and the other jumped in and there was a third shot and a blaze from what can only be presumed to have been a gun in the hands of the one who jumped in. (No bullet hole was found to support the firing of a pistol in the hands of the Ebys.) Langley said he fired back, making in all according to him four shots. The next thing he knew Fred Eby said he was shot. He dressed and went out and Fred Eby was getting in a car across the street. The defendant does not question the sufficiency of the evidence to sustain the conviction.

The sole and only question of merit presented to the court and urged in the defendant's brief relates to Exhibits 3, 11 and 12. While technically it was error to permit Exhibit No. 3 to be introduced in evidence, it can be reconciled within the rule as laid down in Roberts v. State, supra, and other authorities on the subject. It is not denied that save and except for the presence of Ben Eby in the picture pointing to the rocks at the southeast corner of the house, that it was a faithful reproduction of the location of the southeast corner of the house, and the rocks on which the record discloses blood was found the day following the shooting. It establishes the location of the rocks and the place where the decedent, according to the record, fell, and pulled himself up on his feet, after falling. The presence of Ben Eby in this picture pointing was not demonstrative of a theory or hypothetical situation but of a factual situation otherwise established by the evidence and not disputed. It was not an attempt to re-enact the accident but was an attempt to point out admitted things and a place, to wit, the rocks at the southeast corner of the house. As was said in Hudman v. State, 89 Okla. Cr. 160, 205 P. 2d 1175:

"Photographs are admissible in evidence to illustrate or clarify some issue of the case where such photograph is shown to be a faithful reproduction of whatever it purports to reproduce."

The appropriate way to have presented this fact would have been to have pictured the southeast corner of the house minus Ben Eby pointing to the rocks, and then had the witness locate the place and the rocks in the picture. Nevertheless, the pointing in this picture by Ben Eby was an appropriate aid to the jury in applying the evidence. Had the location of the rocks in this case not been pointed out in some manner, because of the over-

growth of grass, the photograph would have been meaningless to the jury. Of course, the proper way to have done this would have been as we have hereinbefore indicated. We believe this to be in keeping with the rule announced in the first syllabus quoted from Roberts v. State, supra, citing to the same effect Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981, 982. This conclusion finds support in the rule laid down in Hall v. State, 78 Fla. 420, 83 So. 513, 8 A.L.R. 1034, in substance, holding that photographs are admissible where such photographs do not themselves constitute a picture version or interpretation of the character of the actual occurrence of the crime. On no basis can Exhibit 3 be construed in any other way than as a purely factual representation. By no means does it constitute an interpretation or picture version of the actual occurrence, or character of the crime. Exhibit No. 3, while on the borderline, was not of such a nature as to be prejudicial to the defendant's rights, and its admission was therefore harmless.

In relation to the claimed error in the admission of Exhibits 11 and 12, this case presents a more difficult but not irreconcilable situation. Before discussing the issue in relation thereto, it is well that we analyze the evidence as to the admitted and conclusive facts. The defendant admitted that he had accused Ben Eby of having relations with Willie Langley, the defendant's wife, and had talked to him about it. It is also admitted by the defendant that he had engaged in a round of drinking the night of the killing. It is further admitted by the defendant that he saw Ben Eby caress his wife in Henry Eby's beer parlor. It conclusively appears that undoubtedly the attentions of Ben Eby to Willie Langley was one of the causes of the divorce between the defendant and his former wife, Willie Langley. Moreover it con-

clusively appears that because of it he made threats against Ben Eby and his wife, Willie Langley, during the night preceding the shooting. The evidence to support his ill will towards Ben Eby is clear and convincing. The evidence to support the defendant's anti-social and ill temper toward everybody in general, even his friends who were with him the early morning of the shooting, is likewise conclusive. It is admitted by defendant Langley that he shot Fred Eby and from the wounds thereby inflicted he died. From what appears in this record it may be likewise concluded that the shot he fired was actuallly directed towards Ben Eby. In this connection it conclusively appears that the Ebys were not armed. The record further shows that the Ebys did not fire a gun in the direction of the defendant, for if they had done so, as he said they did, evidence of the shot would have been found in the west wall of the kitchen where the shooting occurred. No such evidence was discovered, not even by the defendant himself. It is admitted by the defendant that he fired 3 shots, 2 of which formed the basis for the controversy in relation to Exhibits Nos. 11 and 12. These shots the defendant contends were fired by him on the night and the occasion he shot Fred Eby and he says to scare his assailants away. These admissions and conclusive facts bring us to a consideration of Exhibits 11 and 12. At the outset of this consideration it must be recognized that the Attorney General concedes that exhibits 11 and 12 fall within the purview of Roberts v. State, supra, and were therefore technically inadmissible. He further says that "this is exactly what the court held in the Roberts case was improper". With this conclusion we cannot agree. We are of the opinion that the Roberts case is clearly distinguishable from the situation in the case at bar. The rule announced in the Roberts case was in relation to photographic evi-

dence designed to portray or depict the state's theory of the actual occurrence of the alleged crime, while the photographic exhibits Nos. 11 and 12 herein involved were not offered as proof of the state's theory as to how the crime was committed. Proof of the crime was established by clear and convincing evidence, exclusive of exhibits 11 and 12. Exhibits 11 and 12 were not offered to prove the facts of the crime or to establish the state's theory, but instead were offered to establish the occurrence of what the state contends happened subsequent to the crime, as a means of portraying what the state believed to be a fabricated defense. The state's position is not without strong support in this contention. Officers of the law are presumed to do their duty. These presumptions are rebuttable. 22 C.J.S., Criminal Law, § 589, p. 906, Notes 96 and 97, and p. 907, Note 11. We can only presume such in relation to the sheriff of Ottawa county. We must presume that the sheriff made a reasonably thorough inspection of the premises at 6 a. m., and that he returned again at 9:30 and made another reasonably thorough inspection of the premises. He found no bullet holes in the kitchen wall either time. But the defendant offers Mr. Burks, who says he inspected the premises at 3 o'clock the same day and the bullet holes were in the northeast corner wall. The record does not purport to account for what may have transpired between 9:30 a. m., and 3 p. m. Regardless of whether the defendant fired the bullet holes as he claimed, or whether someone else fired them at a subsequent time, this presented a disputed question of fact. This issue of fact was one for the jury to determine. The jury decided it in favor of the state and against the defendant. It was not error to submit this issue to the jury. In Hudman v. State, supra, it was said:

"We have had occasion many times to discuss the admissibility of photographs and have held that the ques-

tion of the admissibility of such photographs in evidence is a matter addressed to the discretion of the trial court. Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851."

Moreover, it has been said that the competency of photographs as evidence is a matter for the court's determination, the weight to be given to the photographs is for the jury. 2 Wharton Evidence 774, Note 2; State v. Witzel, 175 Wash. 146, 26 P. 2d 1049. In this connection, the rule has also been announced that evidence of subsequent circumstances is admissible if it throws light on the transaction, or tends to expose a fabricated defense or false testimony on behalf of the defendant. 30 C.J. p. 205, Note 90; 40 C.J.S. Homicide, § 247, p. 1187, Note 44; Maxwell v. State, 146 Ga. 10, 90 S.E. 279; Bates v. Commonwealth, 189 Ky. 727, 225 S.W. 1085; Hughes v. State, 97 Tex. Cr. R. 607, 262 S.W. 745, wherein Judge Lattimore said:

"We think it provable against the accused that he had attempted to manufacture false testimony in his own behalf and that no error was committed in the admission of this testimony."

Such, basically, is the situation in relation to the ultimate facts sought to be established by state's Exhibits Nos. 11 and 12. It clearly appears, as we have hereinbefore indicated, they were not offered to prove circumstances of the shooting resulting in the death of Fred Eby but were offered to prove a fabricated case of self-defense in relation to things which the state's evidence tended to show occurred subsequent to the crime. For this purpose, in proper form and with proper explanation from the sheriff, they would not have been objectionable. What the law seeks is the goal of truth, it should never shackle itself with technicalities lest it be outrun in the race of justice, by its strongest competitor, false-

hood. The only objection to state's Exhibits Nos. 11 and 12 that can be rightly made is not as to the ultimate facts sought to be established by them, but is as to the manner of proof. In Roberts v. State, supra, we said [82 Okla. Cr. 75, 166 P. 2d 113]:

"Posed photographs taken some time subsequent to the controversy with men in various assumed positions, and things in various assumed situations, intended only to illustrate hypothetical situations are incompetent and inadmissible as evidence."

And therein, quoting from Colonial Refining Co. v. Lathrop, 64 Okla. 47, 166 P. 747, L.R.A. 1917F, 890:

" 'The probative value of photographs depends upon their accuracy. They must be shown by extrinsic evidence to be faithful representations of the place or subject, as it existed at the time involved in the controversy. And photographs taken to show more than this, with men in various assumed positions, and things in various assumed situations, intended only to illustrate hypothetical situations, and to explain certain theories of the parties, are incompetent.' "

And quoting from Massey v. Ivester, 168 Okla. 464, 33 P. 2d 765:

" 'Photographs purporting to depict the conditions at the point of accident may be admitted in evidence, if it is proven or admitted that the objects surrounding the scene of the accident are in the same condition as they were at the time of the acts complained of, but may not be admitted as a "stage setting" for the purpose of re-enacting the accident.' "

The foregoing rules of law clearly apply as to the facts of the crime itself, and had exhibits 11 and 12 been offered in relation thereto, we would be compelled to hold them reversible error in light of these cases. But since they were not offered in relation to the facts of

the crime itself, but as to subsequent occurrences, there are many cogent reasons why their introduction in the form herein submitted is harmless. First, because primary facts of the shooting are established by extrinsic, clear and conclusive evidence other than the photographs represented in Exhibits 11 and 12; second, had the photographs not been used at all, a conviction would most assuredly have been the result, because the evidence otherwise supports the same; third, the photographs are only incidental to the real issue, and should not be permitted to control the outcome of the case where as herein the evidence of guilt is clear and conclusive, as was said in Bates v. Commonwealth, supra [189 Ky. 727, 225 S. W. 1086]:

"It is not only the province but the duty of the court to determine, in the light of the entire record, whether errors therein are such as have affected the real rights of a party and prevented him from having a fair trial upon the real issue."

So far as the real issue is concerned herein, the defendant had a fair and impartial trial and that is the test as to whether he has been denied his substantial rights. Fourth, the photographs exclusive of the poses of the sheriff and special prosecutor and the use they made of the poker strongly support the defendant in his contention that he did fire the two shots in the northeast corner of the kitchen in an attempt to frighten the Ebys when he said they broke the door in. Finally, in light of the entire record, the error as to Exhibits Nos. 11 and 12 was not fundamental, and if the case was again submitted for a second trial to an intelligent and honest jury, we do not believe it could or would arrive at any verdict other than that of guilty. Janeway v. State, 62 Okla. Cr. 264, 71 P. 2d 130, 131. Moreover where the record does not result in a miscarriage of justice and does

not constitute a substantial violation of the defendant's constitutional or statutory rights, the same will not warrant a reversal of the case. Jackson v. State, 84 Okla. Cr. 138, 179 P. 2d 924. In light of the foregoing, we are of the opinion that Exhibits 11 and 12 did not constitute a miscarriage of justice and clearly fall within the provisions of Title 22, O. S. 1941 § 1068, reading in part as follows, to wit:

"No judgment shall be set aside or new trial granted by any appellate court of this State in any case, * * * on the ground of * * * improper admission or rejection of evidence, * * * unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

For all of the above and foregoing reasons, the judgment and sentence herein imposed is accordingly affirmed.

JONES, P. J., and POWELL, J., concur.

JONES, P. J. I think state's exhibits 3, 11, and 12 were posed photographs by the sheriff and special prosecutor, in which they attempt to reinforce the theory of the state as to how and when certain shots were fired causing bullet holes on the inside of the house, and as such posed photographs were clearly inadmissible under the law set forth in Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111.

However, the guilt of the defendant was so clearly established that I do not believe the admission of these photographs in evidence was reversible error. The assessment of the punishment at 25 years when the evidence fully justified a conviction for murder shows the jury

was lenient towards the accused. For that reason, I concur in the conclusion that the judgment should be affirmed.