637 A.2d 1237

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOSEPH
LEE WILSON, JR., DEFENDANT–APPELLANT.

Argued November 30, 1993—Decided February 28, 1994.

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Zulima V. Farber,* Public Defender, attorney; *Mr. Smith* and *Mark E. Tabakman,* Designated Counsel, on the briefs).

*Marsetta Lee,* Deputy Attorney General, argued the cause for respondent (*Fred DeVesa,* Acting Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

The narrow issue presented in this appeal is the admissibility of a videotape presentation of the scene of a crime. Filmed three days after the crime, the videotape depicts the physical location of the witnesses and the murder victim at the time of the crime. The participants in the video do not move or speak. The video, rather than constituting a reenactment of the events, simply gives a spacial overview of the premises and the physical location of the witnesses.

I

This case involves an attempted robbery and a murder at a meat market in Neptune. On February 26, 1988, at approximately 4:00 p.m., the market's two stock clerks, Claude Collins and Moses Williams, were loading meat into a truck outside the market when they were informed by defendant, Joseph Wilson, and his accomplice, Leonard M. Chisum, not to go back into the store because "something was about to happen." Defendant then entered the Fabulous Meat Center with a ski mask pulled down over his face, leaving only his eyes and mouth exposed. The cashier on duty, Paula Crawford, noticed Wilson dancing and skipping around the store wearing a ski mask, but she was not alarmed because she mistook Wilson for a child due to his slight build. She testified that many customers, especially children, wore ski masks into the store in the cold weather.

Wilson then silently stepped out from behind a toy display near Crawford's register, pointing a handgun. He walked over to a second register where the two owners of the store, Brian Kennedy and Peter Szoke, were bagging personal merchandise, and he pointed the gun at Kennedy's face. Assuming the gun to be a toy

like the toy guns he sold in the store, Kennedy leaned back, pushed the gun away from his face, and told Wilson to "get that thing out of here."

Wilson then walked over to Szoke and placed the gun against Szoke's head. Szoke, apparently also assuming the gun to be a toy, put his arm up to push the gun away and told Wilson to "get out of here." Wilson then fired one shot, which struck Szoke in the left temple. Wilson fled the scene, and Szoke died a few days later.

Defendant was arrested and entered a plea of not guilty. The State filed a Notice of Aggravating Factors. A jury convicted Wilson of capital murder, felony murder, armed robbery, conspiracy, aggravated assault, possession of a handgun for an unlawful purpose, and possession of a handgun without a permit. At a penalty trial the jury determined that the death penalty was not the appropriate punishment for defendant. The court sentenced him to life imprisonment with a mandatory minimum parole ineligibility of thirty years on the murder count, as well as consecutive sentences on two other counts totalling six-and-one-half years with a three-and-one-quarter-year parole ineligibility.

The Appellate Division affirmed defendant's convictions but remanded for resentencing. After a resentencing hearing, the Appellate Division affirmed the trial court's reimposition of the same sentence.

We granted Wilson's petition for certification, 134 *N.J.* 475, 634 *A.*2d 522 (1993), "limited to the issue regarding the videotaped reconstruction of the robbery and shooting."

## II

The prosecution introduced the videotape at trial over defendant's objection. The parties do not dispute that Wilson entered the store to commit a robbery, pointed the gun at the victim, and shot Szoke. Defendant claims, however, that the shooting was unintentional. The key issue, therefore, at trial was whether

Wilson had committed the killing purposefully and knowingly, or whether he had accidentally shot Szoke in the head. Defendant told the police that "the man in the store grabbed his arm and he shot the man." Defendant admitted that his statement to the police was not truthful insofar as it stated that the victim had pushed him against the wall. He insisted, however, that Szoke had "yanked him back and forth."

Both Crawford and Kennedy testified that defendant had put the gun to the back of Szoke's head and that Szoke had brushed defendant's arm away, causing defendant to take a step back. Defendant then stepped forward, put the gun back up to Szoke's head, and fired. He then fled the store.

In support of that version of the shooting, the State presented the testimony of the medical examiner who performed the autopsy on Szoke and the testimony of a weapons expert. The examiner concluded from the soot markings around the wound that the shot that had killed Szoke had been fired about six inches away from his head. The weapons expert testified that because of the age and condition of the murder weapon, a deliberate action to pull the trigger had been required to fire the gun.

*The Videotape*

The first scene in the videotape is the view from outside the entrance to the Fabulous Meat Center. The video then cuts to a second scene of the view from inside the store entrance. The third scene, the relevant scene, is again the view on approaching and entering the store through the front door. The video shows the interior of the store, including the merchandise on the shelves, and then focuses on the checkout area consisting of two sets of cash registers and counters.

The camera then enters the store and turns toward the checkout area. Two women and one man are seen standing in the locations where the victim, Crawford and Kennedy were located at the time of the crime. Paula Crawford stands in her position as cashier at the first cash register. An unidentified woman stands behind and to the right of Crawford in the position where Kenne-

dy, the co-owner, was situated. Both Crawford and the unidentified woman stare straight toward the camera with blank expressions.

Detective Green, in plainclothes, stands next to the unidentified woman and is pivoted at an angle in front of the conveyor belt of the second cash register. His position is that of the victim, Szoke. The videotape then shows the location of the cash registers and their proximity to the front door. It also shows Green's position relative to the front door and to both cash registers.

The camera then travels from the front door to the toy display, and then past Crawford at the first register and past the unidentified woman standing in Kennedy's position. The videotape then passes Detective Green standing in Szoke's position. Neither the unidentified woman nor Detective Green moves at all, but Crawford turns slightly toward the camera while it traces Wilson's route towards the cash registers from behind the toy display.

The video is filmed as if Wilson himself were carrying the videotape camera as he traveled through the store on the day of the crime, except that no actor portrays Wilson and no one reenacts any of the movements of the witnesses or the interaction between the witnesses and Wilson. No gun is ever shown, nor is any indication of a shooting. The entire third scene lasts less than a minute.

The camera finally shows the route taken by Wilson to flee the scene and the subsequent route taken by the police to apprehend him.

*Introduction of the Videotape at Trial*

Investigator Glen Meyers of the Monmouth County Prosecutor's Forensic and Technical Services Unit testified that he returned to the store three days after the crime and videotaped the crime scene based on information he obtained from Detective Green of the Neptune Township Police Department and other investigators. He also testified that he had made the videotape under the

direction of Mrs. Crawford. Meyers then gave a detailed account of the actual filming process.

Meyers described the videotape to the jury as follows:

[B]asically the videotape depicts the area immediately outside the Fabulous Meat Store [sic] from two different perspectives, near the front of the store looking out and away from the front door looking back toward the front of the store and then a re-enactment basically of the occurrences leading up to the shooting of Mr. Szoke on the evening of the 26th.

At that point, defense counsel objected and requested a sidebar discussion. Defense counsel argued that the videotape was inadmissible hearsay and that the admission of the videotape would unduly prejudice defendant.

In response to a defense objection, the court viewed the videotape outside the presence of the jury, and ruled as follows:

The objection is going to be overruled. The fact of the matter is that the scene that is depicted in the videotape is as was testified to by the two State's witnesses already. The last woman, Mrs. Crawford very clearly demonstrated where the parties were standing at the time.

The videotape just depicts where those people were standing based upon what she had said ... So there is nothing. The videotape is nothing but a re-creation in a very loose sense of the word because all it does is follow a camera around. It doesn't follow anybody, doesn't show anybody doing anything except just standing there.

The videotape is just depicting the positions of the people who are in the store as testified already to by Mrs. Crawford. It also shows the direction of the travel outside of the store of the defendant as was testified to by Collins already.

There is nothing in that videotape that shows a gun or anything are [sic] anybody moving at [sic]. They are all just standing still. I'm going to allow the videotape in evidence in its complete form as indicated. The objection is going to be overruled. Let's bring the jury in please.

The jury then viewed the videotape.

*After the Introduction of the Videotape*

After the jury saw the videotape, both Brian Kennedy, the co-owner of the store, and Paula Crawford testified. Defendant testified in his own behalf. The videotape had not been shown to any of those witnesses and neither the prosecutor nor defendant's counsel asked them about the videotape. Moreover, neither the

prosecutor nor the defense counsel commented about the video-tape in their summations.

In its charge, the trial court told the jurors that the videotape was "in evidence," and that the court would replay it for them if they wished. During its first full day of deliberations, the jury sent out a note asking to view the videotape. After the jury had screened the video for a second time, the prosecutor asked, "Would you like to see it again? It's only a couple of minutes if you'd like." When the jury foreperson asked to "caucus for a moment," the court interjected, "Only take a couple of minutes. Play it back, do it again." Thus, the jurors viewed the videotape a third time.

The Appellate Division rejected defendant's contention that the videotape was inadmissible, holding that "[t]he videotape, which was based upon information gathered from witnesses and on-the-scene investigation, was a cumulation of the other demonstrative evidence presented by the State and was admissible as a visual aid to assist the jurors in evaluating the case."

### III

Defendant asserts several reasons why the videotape is inadmissible. First, he argues that because the reenactment was not authenticated by a witness to the crime and was not supported by undisputed testimony, it was not admissible. Defendant alleges that to introduce a videotaped reenactment into evidence, the proponent must show that it is substantially similar to the events it portrays. The only reliable way to make that showing is for a witness to authenticate the videotape. Because Investigator Meyers was not present at the crime, defendant contends that his testimony was insufficient to authenticate the videotape.

Closely allied to that argument, defendant claims that the videotape constituted inadmissible hearsay because it was evidence of the out-of-court statements of witnesses to the crime offered to show the truth of the matter asserted in those state-

ments. He characterizes admission of the hearsay as a violation of his Sixth Amendment right to confront witnesses against him.

Defendant asserts also that the videotape's risk of prejudice outweighed its probative value because it showed events about which ample testimony already existed and its admission risked giving the jury an inflammatory "real" image of the crime.

## IV

*Relevance*

A preliminary question in any evidence inquiry is whether the evidence is relevant. All relevant evidence is admissible unless it is forbidden by a specific rule. *Evid.R.* 402 (formerly *Evid.R.* 7(f)); *Simon v. Graham Bakery,* 17 *N.J.* 525, 530, 111 *A.*2d 884, 886 (1955). Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *Evid.R.* 401 (formerly *Evid.R.* 1(2)). Stated otherwise, relevant evidence has probative value, which is the tendency of the evidence to establish the proposition that it is offered to prove. *State v. Hutchins,* 241 *N.J.Super.* 353, 359, 575 *A.*2d 35, 38–39 (App.Div.1990); *State v. Allison,* 208 *N.J.Super.* 9, 17, 504 *A.*2d 1184, 1188 (App.Div.1985).

Before determining whether the videotape was relevant, we note that the videotape is not a reenactment of the crime. The video made no attempt to imitate the actions of defendant or any other person and did not show any of the events that had actually transpired at the shooting. The third scene of the interior of the store, the most significant portion of the videotape, lasted less than a minute.

Indeed, the purpose of the videotape was to assist the jury in picturing the layout of the store, which still photographs already in evidence could not portray. The tape showed the relative positions of the victim, Crawford, and Kennedy in the store at the time of the crime. Based on the testimony of the State's witnesses and of defendant, the video seems to have been substantially

accurate in that regard. *See Marras v. State,* 741 *S.W.*2d 395, 404 (Tex.Crim.App.1987) (rejecting defendant's argument that videotape was not sufficiently accurate, because tape was intended to show only route taken by witness in following defendant and "[did] not depict any staged, re-enacted criminal acts"), *overruled on other grounds by Garrett v. State,* 851 *S.W.*2d 853 (Tex.Crim.App. 1993).

Other courts have held admissible posed photographs representing the position of persons at the scene as reflected in undisputed testimony. II *McCormick on Evidence* § 214, at 16 (4th ed. 1992); *Langley v. State,* 90 *Okla.Crim.* 310, 315–17, 213 *P.*2d 886, 890 (1950) (holding properly admitted photos found illustrative of factual circumstances rather than party's theory or hypothetical situation). Like such posed photographs, the videotape merely depicts the crime scene. Because a depiction of the crime scene, including the relative positions of the witnesses, is highly probative, we conclude that the videotape was relevant evidence.

*Proper Authentication*

The authentication of photographic evidence prior to its admission "seems to contemplate proof that the photograph is a substantially correct representation of the matters . . . offered in evidence, and this includes an 'identification' or statement as to what the photograph shows." M.L. Cross, Annotation, *Authentication or Verification of Photograph as Basis for Introduction in Evidence,* 9 *A.L.R.*2d 899, 900 (1950) (hereinafter Cross). For authentication, a witness must identify the persons, places, or things shown in the photograph or videotape. *Id.* at 905.

The person testifying need not be the photographer, because the ultimate object of an authentication is to establish its accuracy or correctness. To that end, any person with the requisite knowledge of the facts represented in the photograph or videotape may authenticate it. *Id.* at 912. An authenticator need not even have been present at the time the photograph was taken, so long as the witness can verify that the photograph accurately represents its subject. Benjamin V. Madison III, *Seeing Can Be*

*Deceiving: Photographic Evidence in a Visual Age—How Much Weight Does it Deserve?* 25 *Wm. & Mary L.Rev.* 705, 708 (1984).

The question of whether a photograph is sufficiently accurate to justify its admission is a preliminary question for the trial court. Cross, *supra,* 9 *A.L.R.*2d at 915. To authenticate a photograph, testimony must establish that: (1) the photograph is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph. *Garafola v. Rosecliff Realty Co., Inc.,* 24 *N.J.Super.* 28, 42, 93 *A.*2d 608, 615–16 (App.Div.1952).

With technological innovation, motion pictures entered the scene and presented an evidence-authentication challenge for trial courts. As McCormick noted:

> Motion pictures, when they were first sought to be introduced in evidence, were frequently objected to and sometimes excluded on the theory that they afforded manifold opportunities for fabrication and distortion. Even those older decisions which upheld the admission of motion pictures appear to have done so on the basis of elaborate foundation testimony detailing the *methods of taking, processing, and projecting the film.*
>
> [II *McCormick on Evidence, supra,* § 214, at 17 (emphasis added).]

The prosecutor appears to have used that approach by having Investigator Meyers detail the process used in creating the video-tape footage.

As motion pictures have become less of a novelty, a trend has developed away from the more exacting method used to introduce motion pictures towards a simpler method much like that used for photographs:

> More recently, however, it appears to have become more generally recognized that, as with the still photograph, the *reliability and accuracy of the motion picture need not necessarily rest upon the validity of the process used* in its creation, but rather may be established by testimony that the motion picture *accurately reproduces phenomena actually perceived by the witness.*

*[Ibid.* (emphasis added).]

In practical terms, the authentication of a videotape is a direct offshoot of the authentication of photographic and motion picture evidence. *See People v. Heading,* 39 *Mich.App.* 126, 131, 197 *N.W.*2d 325, 329 (1972) (holding videotape admissible on same type of foundation as motion picture because "[a] video tape is nothing more than a motion picture synchronized with a sound recording"). In New Jersey, *State v. Nemesh,* 228 *N.J.Super.* 597, 550 *A.*2d 757 (App.Div.1988), *certif. denied,* 114 *N.J.* 473, 555 *A.*2d 600 (1989), cites II *McCormick on Evidence* § 214 (3d ed. 1984), for the proposition "that a videotape should be evaluated for admissibility just as a motion picture and a similar foundation must be laid." 228 *N.J.Super.* at 604 n. 3, 550 *A.*2d at 761 n. 3. Indeed, as defendant recognizes in his brief, "videotape evidence has now become commonplace in criminal cases." *See, e.g., State v. Rodriquez,* 264 *N.J.Super.* 261, 270–73, 624 *A.*2d 605, 610–12 (App.Div. 1993) (stating victim became ill after direct examination, videotape of cross-examination at hospital played for jury); *State v. Russo,* 243 *N.J.Super.* 383, 391, 579 *A.*2d 834, 838–39 (App.Div.1990) (involving thirty-one-minute videotape of crime scene), *certif. denied,* 126 *N.J.* 322, 598 *A.*2d 882 (1991); *Nemesh, supra,* 228 *N.J.Super.* at 603–04, 550 *A.*2d at 760–61 (discussing videotape of intoxicated driver performing breathalyzer and coordination tests); *State v. Bottomly,* 208 *N.J.Super.* 82, 86, 504 *A.*2d 1223, 1225 (Law Div.1984) (showing videotape of defendant's "belligerent and antagonistic demeanor" after arrest for drunken driving), *aff'd,* 209 *N.J.Super.* 23, 506 *A.*2d 1237 (App.Div.1986); *State v. Bunting,* 187 *N.J.Super.* 506, 508–10, 455 *A.*2d 531, 532–33 (App.Div.) (showing surveillance film of robbery of store), *certif. denied,* 95 *N.J.* 181, 470 *A.*2d 407 (1983).

██ Once a videotape is established as relevant evidence, it is generally admissible under New Jersey's *Evidence Rule* 801(e). *Evidence Rule* 801(e) defines a writing as:

pictures, drawings, photographs, symbols, sounds, or combinations thereof ... set down or recorded by ... photographing, ... mechanical or electronic recording, or by any other means, and preserved in a perceptible form.

*Evidence Rule* 1001(b) provides that "[p]hotographs include still photographs, X ray films, video tapes, motion pictures and similar forms of reproduced likenesses."

Although a videotape qualifies as a writing, to be admissible in evidence the videotape must be properly authenticated. *Evid. R.* 901. *Evidence Rule* 901 provides that the authentication requirement is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims.

The two authoritative cases on authentication of videotapes in New Jersey are *Balian v. General Motors,* 121 *N.J.Super.* 118, 296 *A.*2d 317 (App.Div.1972), *certif. denied,* 62 *N.J.* 195, 299 *A.*2d 729 (1973), and *Nemesh, supra,* 228 *N.J.Super.* 597, 550 *A.*2d 757. In *Balian,* the defense introduced into evidence motion pictures of a test drive of an automobile similar to the one involved in that products-liability controversy. 121 *N.J.Super.* at 125, 296 *A.*2d at 320–21. The motion picture was made at the direction of General Motors' expert to confirm his testimony that the automobile was still steerable even if it was in the same condition that plaintiffs contended their automobile had been in. *Id.* at 122–23, 296 *A.*2d at 319–20.

The Appellate Division held that motion pictures are generally admissible if properly authenticated with: (1) evidence relating to the circumstances surrounding the taking of the film; (2) evidence detailing the manner and circumstances surrounding the development of the film; (3) evidence in regard to the projection of the film; and (4) testimony by a person present at the time the motion pictures were taken that the pictures accurately depict the events as that person saw them when they occurred. *Id.* at 125, 296 *A.*2d at 320–21.

In *Nemesh, supra,* the defendant was convicted of operating a motor vehicle under the influence of intoxicating liquor and with a suspended license. 228 *N.J.Super.* at 601, 550 *A.*2d at 759. The State introduced a videotape of the administration of a breathalyzer and coordination test conducted by the arresting officer. *Id.* at 604, 550 *A.*2d at 761. When the defendant challenged the

authenticity of the videotape, the court applied the *Balian* criteria for proper authentication.

The Appellate Division upheld the admission of the videotape because

> [i]n this case, a police officer testified that the tape accurately and faithfully depicted the administration of the breathalyzer test and the physical tests *as he saw them that evening.* As to a chain of custody, the prosecutor was prepared to produce the custodian of records, but the municipal judge decided that to be unnecessary ...

> Admission of the videotape was well within the municipal court judge's discretion.

[*Id.* at 605 n. 3, 550 *A*.2d at 761 n. 3 (emphasis added).]

■ Unlike this case, both *Balian* and *Nemesh* present situations in which the event on film was the actual event that was the subject of testimony. Nevertheless, those opinions clearly point us to the indisputable conclusion that the videotape of the Fabulous Meat Center was improperly authenticated. In *Balian,* the experiment of the similar car with steering problems was on the videotape and was the subject of the expert's testimony. The expert conducting the experiment could properly authenticate the video even though he had not been at the scene of the original accident because he was presenting evidence solely of the experiment.

Similarly, the *Nemesh* videotape captured the actual breathalyzer test at issue. The police officer who administered the test could properly authenticate the videotape by testifying that the videotape accurately depicted the scene at the time of the test.

In this case, however, the videotape was not rolling at the time of the crime. An investigator who had not witnessed the crime filmed it three days later, and that investigator learned of the positions of the witnesses only through interviews with other investigators. Because the videotape is relevant only if based on its representation of the positions of the witnesses at the time of the crime, only a witness to the actual crime can properly authenticate that the video accurately represents the scene of the crime.

Investigator Meyers could testify only that the video accurately represented what others had told him the scene of the crime looked like. Therefore, Meyers failed properly to authenticate the video because he was not a person present at the time the crime occurred who could testify that the videotape accurately depicted the events as he had seen them *when they occurred.* Both Paula Crawford and Brian Kennedy, on the other hand, could have authenticated the video by testifying that it accurately represented the scene as they had witnessed it. Unfortunately, the State did not show either Crawford or Kennedy the tape.

*Hearsay*

■ Defendant also correctly asserts that the videotape as introduced by Investigator Meyers was inadmissible as hearsay because Meyers did not have personal knowledge to testify that the videotape accurately depicted the scene as it had appeared at the time of the crime. The videotape constituted inadmissible hearsay for virtually the same reason that it was improperly authenticated: Meyers' testimony was based on what others had told him.

The State, however, claims that the videotape was not introduced to establish the truth of the matter but, as determined by both lower courts, was merely "demonstrative evidence ... admissible as a visual aid to assist the jurors." Hence, it was not hearsay. Moreover, the State alleges that even if the tape was hearsay, the availability of the State's eyewitnesses at trial cured the "confrontation" issue.

■ We briefly comment on defendant's assertion that he was unable to confront witnesses to test the accuracy of the videotape. Defense counsel had ample opportunity to cross-examine not only Inspector Meyers but also Crawford and Kennedy about the videotape. He also had opportunity to show the videotape to defendant for his comments. He did none of the above. Because defendant had ample opportunity to confront the witnesses against him, the State did not violate his constitutional right. Moreover, although his failure to examine the witnesses does not cure the

State's failure to authenticate the videotape, it does cast substantial doubt on defendant's challenge to the accuracy of the videotape.

Neither side disputed the general route taken by defendant on entering the store or the positions of Crawford, Szoke, and Kennedy. As the defendant conceded in his Appellate Division brief, "Herein, there was ample testimony from eyewitnesses', uncontradicted for the most part, as to the events that occurred leading up to the shooting." Moreover, both Kennedy and Crawford marked on the still photographs their locations and Szoke's location together with defendant's path in the store. Those positions correspond to their positions on the videotape.

*Potential for Prejudice*

Defendant also alleges that the videotape resulted in undue prejudice to the defendant. Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of undue prejudice. *Evid.R.* 403. The admissibility of potentially prejudicial evidence falls largely within the discretion of the trial court, *see State v. McDougald,* 120 *N.J.* 523, 577–78, 577 *A.*2d 419, 446–47 (1990), and that discretion is broad. *State v. Sands,* 76 *N.J.* 127, 141, 386 *A.*2d 378, 385 (1978). A trial court's mistaken exercise of that discretion exists when the danger of undue prejudice outweighs the probative value of the evidence in that it would divert jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence. *State v. Moore,* 122 *N.J.* 420, 467, 585 *A.*2d 864, 888 (1991) (citing *State v. Sanchez,* 224 *N.J.Super.* 231, 249–50, 540 *A.*2d 201, 210–11 (App.Div.), *certif. denied,* 111 *N.J.* 653, 546 *A.*2d 561 (1988)). On that point, evidence of an inflammatory nature must be excluded under *Evidence Rule* 403 if probative, non-inflammatory evidence on the same point is available. *State v. Davis,* 116 *N.J.* 341, 366, 561 *A.*2d 1082, 1094–95 (1989); *State v. Lockett,* 249 *N.J.Super.* 428, 433, 592 *A.*2d 617, 619–20 (App.Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.*2d 366 (1991).

Because of the indelible impressions that are likely to result from videotaped and other filmed evidence, such evidence

must be subject to careful scrutiny. II *McCormick on Evidence, supra,* § 214, at 19 (discussing difficulty of limiting impressions resulting from "extreme vividness and verisimilitude" of pictorial reenactments); 3 *Wigmore on Evidence* § 798a, at 260 (Chadbourn rev., 1970) (observing that while filmed reenactment can be made to favor proponent's view, "any motion picture is apt to cause forgetfulness of this and to impress the jury with the convincing impartiality of Nature herself"). Nonetheless, the videotape in this case presents no such danger.

The introduction of the videotape was not unduly prejudicial to defendant so as to divert the jurors from a reasonable and fair evaluation of the issue of guilt or innocence. First, the videotape did not address the crux of the dispute at trial: whether defendant had fired behind himself in a panic as he turned to flee, or had coolly stepped up to Szoke and fired the gun inches from Szoke's head. As previously stated, no one disputed the location of the witnesses. Indeed, ample and sufficient evidence verified the conditions appearing on the videotape.

*Harmless Error*

Although the videotape did not unduly prejudice defendant, it was not properly authenticated. Meyers was not called to the Fabulous Meat Center until after the crime had already taken place. Only Crawford and Kennedy, who saw Wilson enter and walk around the checkout area, could properly testify that the course taken by Meyers in filming the videotape accurately depicted the course taken by Wilson at the time of the shooting.

The State could have avoided this entire controversy had either Paula Crawford or Brian Kennedy authenticated the videotape. Both were present at the scene of the crime so they could easily have testified that the videotape accurately depicted the setting. However, the improper authentication error was harmless and clearly not "capable of producing an unjust result." *R.* 2:10-2.

Here, the images depicted in the video focused entirely on undisputed facts. No question existed concerning Wilson's entry into the Fabulous Meat Center, his route of travel towards the checkout area, or his escape route, which were the only subjects of the videotape.

Wilson's defense focused strictly on his interaction with Szoke and the possibility of an accidental shooting when Szoke pushed Wilson. The videotape shows nothing related to that issue. In fact, the videotape could much more easily be characterized as bland instead of inflammatory. Its admissibility into evidence certainly does not result in an abuse of the trial court's discretion and was clearly incapable of affecting defendant's conviction. *State v. Martini*, 131 *N.J.* 176, 251, 619 *A.*2d 1208, 1245–46 (1993).

*Conclusion*

The judgment of the Appellate Division is affirmed.

CLIFFORD, J., dissenting.

This case came to us under false pretenses. We granted defendant's petition for certification, 134 *N.J.* 475, 634 *A.*2d 522 (1993), laboring under the illusion that we would come to grips with the provocative issue of the admissibility, in a capital-murder prosecution, of what the petition referred to as a videotaped *reconstruction* of the robbery and shooting. Had the tape been available before we considered the petition and had we discovered then, rather than after oral argument, that the tape displays little more than a sequential series of crime-scene photos, we would have denied the petition out of hand. At this point, rather than wrestle with a bunch of non-issues, I would vacate certification as having been improvidently granted.

I mean no disrespect to the State, but its insistence that the videotape was properly authenticated is nonsense. For whatever reason, the prosecutor failed to produce any witness to the occurrence to testify that he or she had viewed the tape and that to the witness's knowledge and recollection the still-lifes, the crime scene, and the surrounding neighborhood appearing on the tape

accurately represented the conditions and the locations of the various participants and witnesses as they had existed at the time of the crime. The proposition is so basic, so well-known, as to render unnecessary any citation of authority.

Nor do I mean any disrespect to the defense, but its insistence that the introduction of the videotape was prejudicially erroneous is likewise nonsense. If the three-minute contents do not put the viewer to sleep, they surely induce no more than mild bewilderment, a curiosity about what possible force anyone could be expected to attach to this innocuous little travelogue. The inculpatory potential is non-existent.

Finally, at the risk of straining the bonds of collegiality, and with assurances of my profound respect for the majority, I view the Court's insistence on lavishing its collective energy on this now-unmasked appeal as—well, nonsense. Not one new statement of law comes out of this case, not one heretofore unannounced principle, not one little nuance or refinement of long-existing law—nothing not already familiar to every first-year law student. We should simply acknowledge that the issue is not at all what we thought it was and move on.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For vacation of certification*—Justice CLIFFORD—1.