**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0890-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEROME L. GAYDEN,
a/k/a ROBERT GAYDEN,
JEROME L. GAYDON, and
J SKI,

    Defendant-Appellant.

_____

Argued December 18, 2023 – Decided March 8, 2024

Before Judges Gilson and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 21-10-0676.

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel and on the brief).

Frank Muroski, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Frank Muroski, of counsel and on the brief).

PER CURIAM

Defendant Jerome L. Gayden pleaded guilty to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1). In accordance with a plea agreement, he was sentenced to a five-year term of incarceration with a forty-two-month period of parole ineligibility. He appeals from the August 16, 2022 order of the Law Division denying his motion to suppress evidence seized during what the court found to be a lawful investigatory stop of defendant on a public sidewalk. Defendant argues that the trial court erred in not conducting an evidentiary hearing on his motion to suppress. Because there were disputed issues of material fact surrounding the stop and subsequent search of defendant, we vacate the August 16, 2022 order and remand for a full evidentiary hearing on defendant's motion to suppress.

I.

In light of the trial court having not held an evidentiary hearing, we recite the facts as they are represented in the State's written submissions and as described by the trial court from its out-of-court viewing of a surveillance camera recording of the stop and search. On August 13, 2021, a Paterson police dispatcher transmitted a message to patrol cars that a "caller" reported there was

a suspicious person with a weapon in front of a specific address on Rosa Parks Boulevard.  The dispatcher relayed the caller's description of the person as a black male with dreadlocks wearing blue shorts and a white tank top, using crutches and with a gun in his pocket.  No information was transmitted with respect to how the caller obtained the information the dispatcher conveyed.

Approximately five minutes later, officers arrived at the address, in what they described as a high-crime area, and saw defendant, who matched the physical description provided by the caller.  Officer Mendez filed a written report stating when he and his partner arrived they "made eye contact with [defendant] and he appeared startled by our police presence."  According to the report, Mendez told defendant to stop at which point defendant "immediately accelerated his walking pace while using crutches to further his distance away" from the officers.  Mendez wrote that defendant "was wearing a black fanny pack that had a large bulge around the front of his torso and as he was walking with crutches at a fast pace, it appeared that there was a heavy object inside, due to the manner in which it was sway[ing]."

According to the report, Mendez "wrap[ed] his hand across [defendant's] torso" and "immediately advised [his partner] that he felt a heavy, hard, metallic object inside the fanny pack across his torso."  Mendez's partner then

3

"conduct[ed] the pat down" during which he "observed a black object protruding out of the large pocket on the side of the fanny pack, which [he] immediately recognized as the butt of a handgun." The officers arrested defendant and removed the gun, which was loaded with illegal ammunition. A search of computer records revealed that the gun had been reported stolen in Georgia.[1]

A grand jury indicted defendant, charging him with six counts relating to his possession of a weapon, a large-capacity ammunition magazine, a prohibited device, and stolen property, as well as being in possession of a weapon while a convicted felon.

Defendant moved to suppress the evidence obtained during the stop. He argued that an anonymous tip of criminal activity requires corroboration before officers can conduct an investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968). According to defendant, the officers failed to corroborate the information reported by the anonymous caller. In support of his argument, defendant noted that the video recording showed the officers arrested defendant two seconds after they arrived on the scene, an insufficient amount of time for

---

[1] Although the report is signed by Mendez as the reporting officer, it begins with "I, Off. J. Dabal was assigned to the Emergency Response Team as Unit 514 with my partner Off. H. Mendez" and refers to Mendez in the third person. It is not clear if the narrative in the report was provided by Dabal or Mendez.

them to make the observations described in the police report. Defendant denied the officers ordered him to stop or made eye contact with him. He argued his fanny pack was not swaying because he was moving slowly on crutches and that he made no attempt to flee before the officers arrested and searched him.

According to defendant, the officers nearly hit him with their vehicle when they pulled up to the scene and he had to quickly hop to avoid being struck. Defendant also disputed that the stop took place in a high-crime area. See State v. Goldsmith, 251 N.J. 384, 404 (2022) ("The State must do more than simply invoke the buzz words 'high-crime area' in a conclusory manner to justify investigative stops."). Finally, defendant argued that the video recording, which had been submitted to the trial court by the State, had not been authenticated and was not, therefore, admissible without an evidentiary hearing establishing its authenticity.

On the return date of the motion to suppress, defense counsel requested an opportunity to challenge the officers' credibility and explore the admissibility of the video recording at an evidentiary hearing. The court denied that request and issued an oral opinion based on the written police reports and its viewing of the video recording, which took place outside of the presence of counsel.

A-0890-22

The court began its opinion with its presumption that the caller contacted the police department dispatcher via 9-1-1, that the call was recorded, and that police gathered information about the caller. The court found that these facts, which do not appear in the written police report, were indicative of the caller's reliability.

In addition, based on its out-of-court viewing of the video recording, the court made additional findings of fact. The court stated:

> As for the disputed facts in this case the [c]ourt having reviewed the surveillance footage and either (sic) submitted evidence largely disagrees with the defense's characterization of these events. With regard to the time line the police vehicle can first be seen entering the frame of the surveillance footage at 9:24:01 as it turned onto Rosa Parks Boulevard.
>
> The [c]ourt acknowledges that there is a vehicle parked on the street near where the defendant was standing that would somewhat obstruct the officer[s'] view of him. [W]here the defendant's brief . . . suggests that the officers were only able to observe him for approximately two second as a result of the obstructed view[,] law enforcement appeared to have a clear line of sight to the defendant who's already on the move starting at 9:24 and 09 seconds p.m.
>
> The officers likewise come on a second later and the police vehicle is slowly moving parallel to the defendant as he walks on the sidewalk for another five seconds prior to turning into the driveway at 9:24 and 15 seconds p.m. The [c]ourt notes that this turn was not abrupt by any means. Additionally the defense claims

that the police vehicle stopped suddenly causing the vehicle to shake. However, viewing the surveillance footage it appears to have actually been caused by the front tire of the vehicle passing over the curb.

. . . .

The [c]ourt does not credit the argument that the officers did not and would have been able to observe a large – a bulge in the defendant's fanny pack which swung as though . . . there was a heavy object inside of it.

The officer[s'] vehicle was parallel to the defendant for five seconds as he walked on the sidewalk. The front of their vehicle is then facing the defendant as they pulled into the driveway for an additional four seconds before the officers ultimately exit their vehicle and detain the defendant three seconds later. This means that the police had the opportunity to observe the defendant from a vantage point where they would have been able to see the fanny pack for at least 12 seconds prior to the detention.

Further, during the time frame the defendant took five steps, one larger hop, and then two additional steps. A bag which is weighed down by a heavy object would sway with each step giving the officer[s] clear opportunity to observe it doing so.

Additionally, the fact that the defendant was on crutches would have made the swing of that fanny pack more dramatic because he was limping. Even if the defendant's normal stride did not cause the fanny pack to sway, which the [c]ourt doubts, that bag certainly would have visibly shifted during defendant's hop.

7

The court also made a critical credibility determination based only on its review of the written police report. With respect to defendant's contention that the officers did not tell him to stop, the court found: "[t]his [c]ourt also finds no reason to doubt that Officer Menendez (sic) gave the defendant orders to stop." The court found that even if the officer's car window, which cannot be seen on the video, was closed as the vehicle arrived on scene as defendant contends, and he did not give the order to stop until he exited the vehicle, those facts would "not make the officer's recollection of these events less believable."

The court also found that "in reviewing the police report it appears to this [c]ourt that law enforcement intended to convey that several of the[] things [described in the report] were happening simultaneously" rather than in the sequence described by defendant. The court continued,

> [t]he defendant also claims that he did not make eye contact with the officers and that he was not startled by police but that he hopped out of the way so that he did not get hit by their oncoming vehicle. The [c]ourt does not credit the defendant's argument that he did not appear startled because his subsequent argument contradicts the assertion. The defendant was attempting to get out of the way of a vehicle that he believed would hit him the [c]ourt highly doubts that he would appear unfazed to those around him.

The court stated that it manipulated the video recording during its out-of-court viewing of that evidence:

8

While the [c]ourt does not find to some extent that at least initially the defendant's startled appearance was likely attributable to the car coming toward him it believes that his subsequent actions indicate that he was startled by the police presence as well. Specifically[,] when the [c]ourt zoomed in on the surveillance footage the defendant can be seen turning his head in the direction of the police vehicle. This occurs at 9:24 and 17 seconds p.m. as the vehicle turns into the driveway. It appears as though the vehicle's headlights are what draws the defendant's attention to it and that at this point though it is moving slowly the vehicle's in close proximity to him which would support the defense's argument.

However, within half a second the defendant turns his head back towards the sidewalk and takes on[e] hop. It seems unlikely that [defendant] would take his eyes off that vehicle if he was actually fearful that it was going to hit him.

The court made additional findings of fact based on the video recording. The court found that even assuming the police vehicle's "headlights were bright enough that defendant could not see" the officers in order to make eye contact, "he still would have been able to see that this was a police vehicle." In addition, the court found that "defendant did in fact pick up his pace in the two steps he took following that hop" and "defendant accelerated his pace to nearly double what his stride was initially" once the officers arrived.

Based on these findings, as well its finding that Rosa Parks Boulevard is located in a high-crime area, the court concluded that the officers' observations

9

were sufficient independent corroboration of the caller's report to constitute reasonable articulable suspicion defendant was about to engage in criminal activity to warrant the investigative stop and <u>Terry</u> pat down.[2]

An August 16, 2022 order memorializes the trial court's decision. After the court denied defendant's motion, he entered his guilty plea and was sentenced.

This appeal followed. Defendant raises the following arguments.

> THE OFFICERS' STOP AND SEARCH OF DEFENDANT BASED ON AN UNCORROBORATED, ANONYMOUS 9-1-1 CALL WAS ILLEGAL.
>
> A.    The Police Unlawfully Stopped Defendant.
>
> B.    The Police Unlawfully Searched Defendant.
>
> C.    If This Court Declines to Reverse the Denial of the Motion to Suppress, the Matter Must be Remanded for the Evidentiary Hearing the Defense Requested.

Although the State argues that the trial court correctly denied defendant's motion to suppress, it also concedes "that factual disputes were asserted by

---

[2] The court, acknowledging the holding in <u>Goldsmith</u>, stated the following about whether the location of the stop was a high-crime area: "is that a material issue of dispute? I guess. Maybe it is a material issue of dispute. But at the end of the day the fact of the matter is even if you remove that from the equation everything else here provides an articulable and reasonable suspicion to law enforcement to stop this particular defendant."

defendant that required an evidentiary hearing where credibility and factual findings should have been made to establish a record on which this [c]ourt can perform a full appellate review of the legal issues presented."

## II.

Both the federal and state constitutions protect citizens against unreasonable searches and seizures. See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. The parties agree that the officers' encounter with defendant was an investigatory stop, which constitutes a seizure under both the federal and state constitutions. An investigatory stop or detention, sometimes referred to as a Terry stop, involves a temporary seizure that restricts a person's movement. A Terry stop implicates a constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Elders, 192 N.J. 224, 247 (2007) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). The State has the burden to establish that a stop was valid. State v. Mann, 203 N.J. 328, 337-38 (2010); State v. Pineiro, 181 N.J. 13, 20 (2004). If there was no reasonable suspicion of criminal activity to justify the stop, evidence discovered as a result of the stop is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

11

To determine whether reasonable suspicion existed, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation.  State v. Nelson, 237 N.J. 540, 554 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)).  Investigatory stops are justified "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur."  State v. Davis, 104 N.J. 490, 505 (1986).

> A [judge] must first consider the officer's objective observations.  The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.  [A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person.  The process does not deal with hard certainties, but with probabilities."  Second, a [judge] must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."
>
> [Id. at 501 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (alterations in original).]

"The proper mechanism through which to explore the constitutionality of warrantless police conduct is an evidentiary hearing."  State v. Atwood, 232 N.J. 433, 445 (2018) (first citing N.J.R.E. 104; and then citing State v. Gamble, 218 N.J. 412, 419 (2014)).  When there are disputed material facts, the State must

present witnesses at the evidentiary hearing to substantiate the basis for the challenged warrantless conduct and where "the defense is afforded the opportunity to confront and cross-examine the State's witnesses." Ibid.; see also R. 3:5-7(c) (requiring testimony to be taken in open court "[i]f material facts are disputed . . . .").

An evidentiary hearing is mandated where "the parties made clear in their respective written submissions that they had diametrically irreconcilable accounts about what [police officers] claimed occurred when [they] approached [the] defendant." State v. Parker, 459 N.J. Super. 26, 30 (App. Div. 2019). "The motion judge . . . must make factual findings that will be substantially influenced by an opportunity to hear and see the witnesses." Ibid.

We agree with defendant that the trial court erred when it resolved disputed issues of material fact relating to his motion to suppress without holding an evidentiary hearing. The parties dispute a number of critical facts surrounding the officers' stop and search of defendant. Material facts in dispute include, among others, whether: (1) the caller used the 9-1-1 system to report information to police; (2) the officers made eye contact with defendant when they arrived on scene; (3) defendant appeared startled by police presence; (4) the officers ordered defendant to stop and had sufficient time to give such an

A-0890-22

order before arresting defendant; (5) defendant attempted to flee; (6) the officers had sufficient time to make the observations detailed in their written report; (7) whether the stop took place in a high-crime area; and (8) whether officers observed defendant's fanny pack swaying in a manner indicative of it containing a heavy object. The trial court resolved all these issues without the benefit of hearing sworn testimony from the officers and possibly defendant. Instead, the court made credibility determination based on a written police report and its viewing of a video recording outside the presence of counsel. Defendant was not given an opportunity to challenge the credibility of the officers through cross-examination, test the admissibility of the video recording, offer his view of what is depicted in the video recording, and raise objections to the trial court's manipulation of the recording by magnifying its images through "zooming in."[3]

We, therefore, vacate the August 16, 2022 order and remand for an evidentiary hearing on defendant's motion to suppress. Because the judge who decided defendant's motion has already engaged in weighing the evidence and rendered an opinion on the credibility of the defendant and officers, the hearing

---

[3] We note that a video recording must be properly authenticated before it can be admitted as evidence. See State v. Wilson, 135 N.J. 4, 16 (1994).

14

should take place before a different judge.  See N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 617 (1986).

We are not vacating defendant's conviction.  If, after the evidentiary hearing, the evidence is suppressed, defendant can move to withdraw his guilty plea.  If the evidence is not suppressed, defendant can decide if he wants to appeal from the ruling following the remand.

The August 16, 2022 order is vacated and the matter is remanded for a full evidentiary hearing on defendant's motion to suppress.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0890-22