**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1940-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DARIUS D. BOLDEN,

    Defendant-Appellant.

_____

Argued January 23, 2025 – Decided May 15, 2025

Before Judges Mayer, Rose and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 19-12-1268.

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Khyzar Hussain, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Stephanie Davis Elson, Assistant Prosecutor, of counsel and on the brief; Khyzar Hussain, on the brief).

PER CURIAM

A jury convicted defendant Darius D. Bolden of murder and related weapons offenses for the August 27, 2016 fatal shooting of Jason Dunbar on the front porch of Dunbar's home on Fulton Avenue in Jersey City. After denying defendant's motion for a new trial and ordering the appropriate mergers, the trial court sentenced defendant to an aggregate prison term of forty-five years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the murder conviction. A judgment of conviction was issued on November 4, 2022.[1]

The State argued defendant executed Dunbar because he was embarrassed by public comments posted on a widely viewed Facebook "fight video." The State claimed the video depicted Dunbar pushing defendant to the ground after defendant intervened in a physical altercation between Dunbar and defendant's friend, Anthony Holmes, a/k/a "Streets." In his September 4, 2019, pre-arrest statement to police, defendant acknowledged a video of the fight was posted on social media but claimed he was not upset about the fight or video, stating, "you win some, you lose some." Police did not display the fight video during the

---

[1] Defendant's sentence was imposed concurrently to a three-year prison term imposed the same day as his conviction for possession of a controlled dangerous substance charged under an unrelated indictment. That conviction is not challenged on appeal.

interview. But they showed defendant surveillance footage of a Chevrolet Trailblazer near the murder scene. Based on the car's distinct characteristics, the detectives told defendant they believed the Trailblazer was his vehicle.

Defendant was arrested one month after he gave his statement to police. In December 2019, defendant was charged in a Hudson County indictment with: first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1).

Among other pretrial motions, defendant challenged the stop of the Trailblazer on September 4, 2019, and the seizure of his cell phones as fruit of the poisonous tree. Following an evidentiary hearing, defendant filed a brief expanding his argument. Defendant contended his cell phones were seized from his person or the Trailblazer before the warrant for the vehicle was executed. The same judge, who had executed the search warrants for the vehicle and phones, denied defendant's suppression motion and his ensuing reconsideration motion.

The matter was assigned to another judge for trial. Prior to trial, the court denied defendant's motion to bar the State from introducing into evidence the fight video on authentication grounds. The court further rejected defendant's

A-1940-22

application to redact large portions of his September 4, 2019 statement to police, ruling the police commentary in question constituted permissible police interrogation tactics. The court also denied defendant's reconsideration motion.

Trial was held on multiple days during the summer of 2022. The State presented the testimony of nearly two dozen witnesses and moved into evidence about 200 exhibits. The only witness to the homicide, Letia Johnson, could not identify the shooter, who was wearing a black ski mask, which covered most of his face at the time of the shooting. Johnson explained after firing the shots, the shooter then walked toward Rose Avenue "the same way they [sic] came." Thus, the evidence against defendant was largely circumstantial: defendant's cell phone records placed his phone near the crime scene; surveillance footage and data from automatic license plate reader (ALPR) technology depicted the Trailblazer near the crime scene; and Johnson identified defendant on the fight video and testified "a lot of people" saw the video.

Defendant did not testify or present any evidence on his behalf. The defense argued the State failed to pursue numerous investigative leads and someone else was the shooter.

During deliberations, the jury requested a transcript of defendant's statement to police and the "video of Rose and Fulton before and after the

shooting." With the parties' consent, the court told the jury "there [wa]s no transcript" and replayed the pertinent portions of the requested surveillance video in open court. Prior to rendering its verdict, the jury twice indicated it was deadlocked.

On appeal, defendant raises the following points[2] for our consideration:

POINT I

THE WARRANTLESS SEIZURES OF THE PHONES WERE ILLEGAL.

POINT II

THE INAPPROPRIATE ADMISSION OF A NON-AUTHENTICATED VIDEO, FOLLOWED BY THE INAPPROPRIATE TESTIMONY AND ARGUMENT ABOUT THAT VIDEO, NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

A. The Video Was Not Authenticated And Therefore Was Inadmissible.

B. The Comments On The Video Were Inadmissible And Unduly Prejudicial.

C. Johnson's Testimony About The Video Was Inadmissible Hearsay And Speculation.

---

[2] Defendant's point headings cite the court's entire decision or order and not "the place in the record where the opinion or ruling in question is located." R. 2:6-2(a)(1).

D. The State Misrepresented The Limited Evidence Presented About The Video In Closing and Engaged in Improper Speculation.

E. Individually Or Cumulatively, The Video Evidence Errors Require Reversal Of [Defendant]'s Convictions.

## POINT III

THE ADMISSION OF PORTIONS OF THE INTERROGATION IN WHICH OFFICERS OPINE ON DEFENDANT'S GUILT AND RELAY HEARSAY, AS WELL AS THE PORTION IN WHICH DEFENDANT INVOKED HIS RIGHT TO COUNSEL, DEPRIVED DEFENDANT OF A FAIR TRIAL.

A. Failure To Redact The Officers' Inappropriate Lay Opinions And Hearsay From The Interrogation Necessitates Reversal Of Defendant's Convictions.

B. The Failure To Redact Defendant's Invocation Of His Right To Counsel And The Misuse Of That Invocation In Closing Necessitates Reversal Of Defendant's Convictions.
[(Not Raised Below).]

C. The Failure To Properly Redact The Interrogation Footage Requires Reversal Of Defendant's Convictions.

## POINT IV

IMPROPER ARGUMENTS MADE BY THE PROSECUTOR, AS WELL AS THE INAPPROPRIATE ADMISSION OF MISLEADING DIAGRAMS CREATED BY THE PROSECUTOR,

A-1940-22

REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

A. The Prosecutor's Argument, Which Diluted The State's Burden Of Proof, Requires Reversal Of Defendant's Convictions, Especially Given [T]he Failure To Instruct The Jury On The State's Burden To Prove The Identity Of The Shooter Beyond A Reasonable Doubt.
[(Not Raised Below).]

B. The Prosecutor's Argument That The State's Expert Was Credible Because The State Doesn't "Pay Him" Requires Reversal Of Defendant's Convictions.
[(Not Raised Below).]

C. The Prosecutor's Use Of Misleading Charts He Himself Created As Exhibits Admitted Into Evidence Through Lay Witnesses That Did Not Prepare These Charts Requires Reversal Of Defendant's Convictions.

D. Prosecutorial Misconduct Requires Reversal of Defendant's Convictions.

## POINT V

EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not Raised Below)[3]

---

[3] Notwithstanding defendant's indication otherwise, defense counsel contended cumulative errors deprived defendant of a fair trial during oral argument on his motion for a new trial.

A-1940-22

AT SENTENCING, THE COURT FAILED TO EXPLAIN WHY IT REJECTED MITIGATING FACTORS BROUGHT TO ITS ATTENTION. THE SENTENCE MUST BE VACATED, AND THE MATTER REMANDED FOR A RESENTENCING.

Having considered defendant's arguments in view of the record and guiding legal principles, we are persuaded by most of the contentions raised in point III and conclude the cumulative effect of those errors, and additional errors raised in points II and IV, warrant reversal of defendant's convictions. We further address defendant's remaining contentions raised in points II and IV for guidance in the event of a retrial. As to the claims raised in point I, because we cannot conclude on the existing record whether the motion court's decision is supported by the record, we remand for the limited purpose of reopening the evidentiary hearing as to the circumstances of the seizure of defendant's cell phones. In view of our disposition, it is unnecessary to reach defendant's sentencing argument raised in point VI.

I.

In point I of his merits brief, defendant argues the State unlawfully seized his cell phones without a warrant following a stop of his Trailblazer on September 4, 2019, requiring suppression of the evidence obtained from both

phones. We summarize the testimony adduced during the one-day testimonial hearing and defendant's evolving claims before the motion court after his application was filed.

A.

On September 30, 2021, defendant filed a notice of motion generally seeking to suppress evidence seized in violation of the state and federal constitutions, but did not file an accompanying brief. That same day, during the scheduled plea cutoff conference, defense counsel noted he filed the motion based on information acquired during the N.J.R.E. 104(c) hearing held earlier that year. Counsel explained defendant challenged the warrantless stop of the Trailblazer, and the warrantless seizure of the vehicle and any property recovered therein. At that time, defendant did not claim the cell phones were unlawfully seized from his person.

Detective Brent Porter of the Hudson County Prosecutor's Office-Homicide Unit (HCPO-HU), testified on behalf of the State. Through Porter's testimony, the State moved into evidence several screenshots of surveillance video footage. Defendant did not testify or present any evidence on his behalf.

Porter explained the circumstances giving rise to the stop of defendant's Trailblazer. Using video footage and ALPR technology, police determined the

Trailblazer "ma[de] a circuitous route around the crime scene prior to the homicide." Police also identified the Trailblazer's registered owner and his home address.

Prior to the stop, HCPO-HU detectives attempted to speak with the Trailblazer's owner at his home, but learned from his father that he was admitted to an out-of-state rehabilitation facility. The father advised police the Trailblazer was in possession of his son's friend, who once came to the house to give the father money for parking citations because the citations were sent to the registered owner's home.

Porter and his partner then traveled to Greenville Avenue in Jersey City, where the citations were issued, and observed the Trailblazer parked on the south side of the street. At some point, defendant exited a house on Greenville Avenue, entered the Trailblazer, and drove off. Porter and his partner followed the Trailblazer and ultimately conducted a motor vehicle stop. Police towed the vehicle pending application of a search warrant, which was issued the following day for the Trailblazer and defendant's two cell phones. Prior to stopping the vehicle, police had not identified a murder suspect but considered defendant "a person of interest."

A-1940-22

On cross-examination, the motion court sustained the prosecutor's objection to defense counsel's line of inquiry as to whether defendant was "allowed to take any of his personal property with him," including his cell phones, after the Trailblazer was stopped. The court agreed with the prosecutor that defendant limited the scope of his suppression motion to the stop of the Trailblazer. In response to defendant's argument that he sought to suppress "the fruit of the unlawful motor vehicle stop, which include[d] the cell phone that was taken from his person," the court replied, "if I find the stop was unlawful then everything that came out of it will be suppressed."

Arguments on the motion were conducted the following month. Without conceding police had probable cause to conduct the stop, defendant primarily contended a warrant was required to stop and seize the vehicle. He further argued police created an exigency to stop the Trailblazer, "seize[d] his cell phones without a warrant, and then wait[ed] twenty-four hours to get a warrant."

On February 22, 2022, the court issued a written decision and memorializing order denying defendant's motion.[4] Pertinent to this appeal, in

_____

[4] In the same order and decision, the court granted the State's motion to admit evidence of the fight between defendant and Dunbar, including the fight video, pursuant to N.J.R.E. 404(b). On appeal, defendant neither challenges the stop

its summary of the facts and procedural history, the court noted "[d]efendant's cell phones were left in the seized Trailblazer."

Defendant moved for reconsideration raising three points that are not reprised on appeal. During oral argument on February 24, 2022, in response to defense counsel's argument that police seized defendant's phones without a warrant, the court rhetorically asked, "weren't the phones in the car?" The court did not recall "testimony that the phones were removed from the car."[5] For the first time during argument, defense counsel indicated the search warrant for the Trailblazer and the search warrants for defendant's phones were signed on the same day "in a row."

Notably, during the evidentiary hearing, defendant did not move to admit into evidence the search warrant for the Trailblazer and the communications data warrant (CDW) for defendant's two cell phones, which included an order to search both phones (collectively, CDW-order). Nor were the warrants, order, or Porter's supporting affidavits appended to defendant's reconsideration motion.

_____

of the Trailblazer nor the court's N.J.R.E. 404(b) decision memorialized by the February 22, 2022 order.

[5] Based on our review of the suppression hearing transcript, we agree with the court's recollection.

Following oral argument, however, on February 28, 2022, defendant filed a supplemental letter, attaching the warrants, order, and affidavits.

Defendant argued the following statement, included in paragraph 27 of the CDW-order, supported his contention that the phones were seized after the warrant was executed on the Trailblazer: "[Defendant] provided the cellular calling numbers of 201-[XXX]-[XXXX] and 201-[YYY]-[YYYY] for the phones in his possession at the time of the motor vehicle stop, which were seized pending the current [CDW a]pplication." Defendant further argued "[a]ll three warrants were approved by this [c]ourt at the same time: 4:30 p.m. on September 5, 2019." Defendant reiterated his phones therefore were seized "without a warrant and without any other independent justification" because, when they were seized, police lacked probable cause to believe the phones would contain evidence of a crime or that defendant committed the homicide. He also argued police lacked "a reasonable articulable suspicion that would [have] justif[ied] a temporary seizure of his person or property."

On March 23, 2022, the court issued a written decision and memorializing order denying defendant's reconsideration motion. Relevant to defendant's argument on appeal, the court noted defendant's contention concerning the timing of the seizure of his phones was first raised in his February 28, 2022

13

supplemental letter.  The court nonetheless addressed the argument and found defendant "[d]id not suggest that the phones were seized pursuant to an unconstitutional search of [his] person," such as "an impermissibly intrusive pat down" or "though excessive force."  Instead, defendant argued the stop of the Trailblazer "was unreasonable and everything flowing therefrom must be suppressed."

The court found defendant "had ample opportunity to clarify [his] specific position and develop the record."  Although the court noted the record was unclear as to "whether the cell phones at issue were seized from [d]efendant's person or from the . . . Trailblazer," the court found police "acted quickly in obtaining the requisite orders to continue to hold and eventually search [d]efendant's phones."  The court concluded police "were objectively reasonable in seizing [d]efendant's cell phones following the motor vehicle stop."

We thereafter denied defendant's motion for leave to appeal from the court's February 22 and March 23, 2022 orders.  State v. Bolden, No. AM-0452-21 (App. Div. Apr. 18, 2022).

Defendant maintains the court erroneously denied his suppression motion.  Citing the warrant application, defendant contends the phones were unlawfully seized before issuance of the search warrant for the Trailblazer.  Defendant

argues either the phones were unlawfully removed from the vehicle or his person. He further asserts the court "inverted the burden" on defendant's motion and "blam[ed] the lack of record on the defense."

B.

Ordinarily an appellate court's "standard of review on a motion to suppress is deferential." State v. Nyema, 249 N.J. 509, 526 (2022). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Courtney, 478 N.J. Super. 81, 90 (App. Div. 2024) (alteration in original) (quoting State v. Ahmad, 246 N.J. 592, 609 (2021)). Legal conclusions are reviewed de novo. State v. Radel, 249 N.J. 469, 493 (2022).

As a preliminary matter, we are not persuaded the court shifted the burden to defendant. Defendant initially argued his phones were unlawfully seized as fruit of the poisonous tree following an unlawful stop. During the evidentiary hearing, defendant did not question Porter about his affidavit supporting the CDW-order or otherwise call into question the timing of the warrants for the Trailblazer and defendant's phones. Indeed, defendant did not submit to the court, or otherwise cite, the CDW-order and supporting affidavit until five

months after his suppression motion was first filed – without an accompanying brief. A defendant must "state the basis of the suppression motion <u>when making it</u> and also introduce all of his proofs on the issue of the search and seizure <u>at that time</u>." Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3 on <u>R.</u> 3:5-7 (2025) (emphasis added) (citing <u>State v. Bacome</u>, 228 N.J. 94, 108 (2017)); <u>State v. Robinson</u>, 200 N.J. 1, 18-19 (2009). Defendant did not do so here.

However, because the motion court considered defendant's belated argument, his renewed contentions are properly before us. Having considered those contentions in view of the motion record, we cannot conclude that the court's "findings are supported by sufficient credible evidence in the record." See <u>Ahmad</u>, 246 N.J. at 609.

Although the motion court recognized there was no evidence in the record indicating whether defendant's cell phones were seized from his person or the Trailblazer, the court summarily concluded the seizure of the phones was "objectively reasonable." In our view, however, resolution of the circumstances of the seizure in the case is critical to the court's determination whether the warrantless seizure of defendant's cell phones and the admission of all information derived from forensic analysis of the physical phones was lawful.

Notably, defendant was not arrested when the Trailblazer was stopped or after his interview with police that same day.

Accordingly, we remand the matter to the motion court to reopen the evidentiary hearing for the limited purpose of determining the circumstances surrounding the seizure of defendant's phones, including the timing and manner of the seizure. We take no position on the outcome of the issue on remand. On remand, the parties shall provide their appellate submissions to the court. We leave to the court's sound discretion whether to permit further briefing and argument.

Our conclusion is limited, however, to the seizure of defendant's cell phones and data recovered from a forensic search of the physical phones. Defendant does not challenge issuance of the CDWs for subscriber information, call detail records, or historical cell-cite location information furnished by his cellular provider. An issue not briefed is deemed waived. See Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2025). We note only police sought the CDWs after defendant provided both cell phone numbers during his September 4, 2019 interview, wherein defendant acknowledged he "operate[d] both" phones on the night of the incident.

## II.

In his third point, defendant acknowledges the trial court correctly determined the rules of evidence do not apply to investigative techniques utilized during police interrogations. But defendant argues the court erroneously denied his application to redact "significant portions" of his September 4, 2019 statement because the evidence rules prohibit police from testifying about the same information at trial. Defendant maintains the failure to redact the following categories of the detectives' commentary requires reversal of his convictions: (1) stating with certainty that the car depicted in the surveillance video was defendant's vehicle; (2) expressing skepticism that defendant was truthful during the interview; (3) opining a jury would convict defendant based on his denial of guilt; and (4) reiterating hearsay that many people spoke with police about the fight video. Defendant claims the detectives' statements constituted inadmissible hearsay or lay opinion. For the first time on appeal, defendant further argues the failure to redact his invocation of the right to counsel and the prosecutor's comments on that right warrant reversal of his convictions.

A-1940-22

A.

Before the trial court, defense counsel argued for the same reasons that a police officer cannot opine about a defendant's guilt while testifying at trial, the court should redact the detective's comments about defendant's guilt during the September 4, 2019 interrogation.  Acknowledging police did not expressly call defendant a liar, the defense "suggest[ed] the implication of an officer asking the same question a dozen times in a row with increasing incredulity is that the officer believes the defendant to be lying."

Distinguishing our decision in State v. Tung, 460 N.J. Super. 75, 101 (App. Div. 2019), where we held police impermissibly opined about defendant's lack of truthfulness while testifying at trial, the trial court found the detectives' statements reflected valid interrogation tactics.  The court thus denied defendant's motion to redact the statement but permitted defense counsel to further brief the issue.

Shortly thereafter, defendant moved for reconsideration, explaining each redaction request sought in his initial motion.  Following argument, the court again denied defendant's application and reiterated police interrogation was not governed by the rules of evidence.  But the court directed redaction of the interrogation video to eliminate any "gang affiliation" references, finding they

19

were "inappropriate." The court also agreed with the State's suggestion to include a jury instruction that "what the detectives say in an interrogation [is not] evidence"; defense counsel questioned whether the "bell c[ould] be unrung" if the statement were not redacted; the court did not issue a limiting or final instruction on this issue.

The State introduced defendant's video recorded statement through HCPO-HU Detective Aedan Stabile. Just prior to playing the recording, the prosecutor elicited the following explanation from Stabile about police interrogation tactics:

> Based on what we know in the investigation, we could confront the person that we're speaking with, with direct evidence that we have to see if they're telling the truth or lying to us. Based on their answer, we could go either way. But if there is [sic] lies, we then will keep confronting him with direct evidence that suggests why they're lying and how we know they're lying.

Stabile acknowledged police utilized these techniques "[a]t times" during defendant's interview.

During the two-hour interrogation, defendant confirmed he had the Trailblazer "for a couple of months." He admitted he drove the vehicle on the night of the incident but claimed he was "nowhere near th[e] area" of the shooting. Stabile responded, "that's impossible . . . [b]ecause we have your car

20

on video." After reviewing the video footage with defendant and explaining police identified his vehicle with a license plate reader, defendant maintained "that can't be my truck, man. I -- I don't recall being like in that area."

Throughout the interview, Stabile and his partner expressed disbelief about defendant's disavowal, commenting "your car is by a murder"; "we can't change what's unchangeable . . . that car is hit on the license plate reader with video"; "that's the story that you're sticking to . . . [e]ven though I just told you that we tracked this car all over town"; and there was "[n]o fucking way" the video footage depicted a different vehicle. Stabile encouraged defendant to "give [police] something to work with" and "speak the truth." Stabile told defendant if the case went to "courts, judges, jurors and all that stuff . . . with no explanation from . . . [his] side of things" then "it's a wrap" against him.

The interview concluded after a lengthy statement by Stabile, including police "already know the facts and we're actually giving you the opportunity to speak your mind to give -- to help your benefit." The final exchange ensued:

> []DEFENDANT: -- I been trying to talk to
> you all too but since you want to yell, I want a
> lawyer.
>
> []STABILE: All right.
>
> []DEFENDANT: I -- I – I'm done talking.

[]STABILE: We (indiscernible) spend enough time (indiscernible) --

[]DEFENDANT: I'm done talking.

[]STABILE: Want to know why I'm yelling?

[]DEFENDANT: I'm done talking.

[]DETECTIVE STABILE: Because --

[]DEFENDANT: I'm done talking. I'm done talking to you.

[]STABILE: All right. Listen, it's your future.

B.

We apply a deferential standard of review to the trial court's evidentiary rulings. See State v. Garcia, 245 N.J. 412, 430 (2021). We will only reverse if the court's evidentiary rulings were "so wide of the mark that a manifest denial of justice resulted." State v. Kuropchak, 221 N.J. 368, 385 (2015) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). If we determine the court mistakenly exercised its discretion, "we must then determine whether any error found is harmless or requires reversal." State v. Gonzalez, 249 N.J. 612, 633 (2022) (quoting State v. Prall, 231 N.J. 567, 581 (2018)).

The harmless error test "depends upon some degree of possibility that [the error] led to an unjust verdict. The possibility must be real, one sufficient to

22

raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273 (1973); see also R. 2:10-2. Similarly, under Rule 2:10-2, where there was no objection to the claimed error at trial, we review the issue for plain error and may reverse only if the error was "clearly capable of producing an unjust result."

"[I]n appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial." State v. Allen, 254 N.J. 530, 550 (2023).

### 1. Lay Opinion and Hearsay

Lay opinion testimony is governed by N.J.R.E. 701, which permits "testimony in the form of opinions or inferences . . . if it (a) is rationally based on the witness'[s] perception; and (b) will assist in understanding the witness' testimony or in determining a fact in issue." In State v. McLean, 205 N.J. 438, 460 (2011), our Supreme Court made clear permissible factual testimony by police "includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge."

Lay opinion testimony therefore cannot opine about another witness's credibility, particularly where witness veracity is a pivotal point of dispute. See State v. Frisby, 174 N.J. 583, 595-96 (2002) (holding a police officer cannot testify that a defendant's statement is a lie); State v. Branch, 182 N.J. 338, 351 (2005) (recognizing a police officer cannot "imply to the jury that he [or she] possesses superior knowledge, outside the record, that incriminates the defendant"). Similarly, in Tung, we cautioned:

> Police testimony concerning a defendant's guilt or veracity is particularly prejudicial because "[a] jury may be inclined to accord special respect to such a witness," and where that witness's testimony goes "to the heart of the case," deference by the jury could lead it to "ascribe[] almost determinative significance to [the officer's] opinion."
>
> [460 N.J. Super. at 102 (alterations in original) (quoting Neno v. Clinton, 167 N.J. 573, 586-87 (2001)).]

In the present matter, the trial court correctly observed the police tactics at issue were not adduced during trial testimony and police are not bound by evidentiary rules during their interrogations. Indeed, police are entitled to significant leeway in their interrogation techniques. See State v. L.H., 239 N.J. 22, 43-44 (2019). Recognizing a suspect's "natural reluctance . . . to admit to the commission of a crime and furnish details," an interrogating officer can use tactics "to dissipate this reluctance and persuade the person to talk," as long as

"the will of the suspect is not overborne." State v. Miller, 76 N.J. 392, 403 (1978).

Here, however, defendant did not challenge the propriety of the detectives' interrogation techniques or otherwise argue his will was overborne during the interrogation. Notably, defendant maintained his innocence throughout his statement to police and invoked a third-party guilt defense at trial. Accordingly, credibility was central to his defense. Because defendant's redaction motion was raised before the trial court, the issue before us is whether inclusion of the interrogation tactics in this case was erroneous and, if so, whether the inclusion "led to an unjust verdict." See Bankston, 63 N.J. at 273.

The parties have not cited, and our independent research has not revealed, any authority solely addressing the inclusion of interrogation tactics in a statement admitted at trial when those tactics constituted inadmissible lay opinion, which could not be elicited from the detectives during their trial testimony. As defendant argues, however, the tenor of the detectives' questioning during the interrogation suggested their belief in his guilt and their disbelief in his rendition of the facts constituted lay opinion, which were barred during their trial testimony. Indeed, prior to trial, the prosecutor agreed when

questioning the detectives about the surveillance video, the State "w[ould] not have them say, 'This is the Trailblazer. This is [defendant]'s vehicle.'"

To be admissible at trial, statements by an interrogating detective must comply with the rules of evidence and not deny the defendant the right to a fair trial. See State v. Patton, 362 N.J. Super. 16, 49 (App. Div. 2003) (holding "the use of police-fabricated evidence to induce a confession that is then used at trial to support the voluntariness of a confession is per se a violation of due process"). The trial court recognized as much when it redacted references to gang affiliation. See N.J.R.E. 404(b) (providing, absent certain criteria not relevant here, evidence of bad acts generally is not admissible at trial).

The detective's statements were particularly troublesome because they interpreted the images depicted in the video footage, indicating their belief that defendant's car was in the area of the fatal shooting − a disputed fact he never conceded. The detectives questioned defendant for about two hours, repeatedly challenging his "story" and claiming it was "impossible" that the video surveillance footage did not depict his vehicle in view of its distinctive characteristics. Further, the detectives expressed doubt that a jury would acquit defendant and suggested he had an obligation to explain himself, impinging on his Fifth Amendment right to avoid self-incrimination. Given their status as law

enforcement officers, the detectives' repeated commentary on defendant's "veracity [wa]s particularly prejudicial."  See Tung, 460 N.J. Super. at 102.

Had the detectives made similar comments at trial, their testimony would have been excluded as improper lay opinion because those statements were "an expression of a belief in defendant's guilt."[6]  See McLean, 205 N.J. at 463.  The State cannot violate the evidentiary rules and defendant's constitutional rights by presenting improper lay opinion through a different means.  Ultimately, the unredacted interrogation video presented the same risk of affecting the jury's perception of defendant's credibility as the detective's in-court testimony in Tung, 460 N.J. Super. at 102.

As our Supreme Court has explained:

> We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, to assure the complete opportunity of the jury

---

[6]  Relatedly, for the first time on appeal, defendant argues Stabile and HCPO-HU Detective Guershon Cherilien impermissibly testified about the unique identifiers on defendant's car and on two occasions, commented the different clips of the surveillance footage captured "the same vehicle."  Because defendant did not object to this portion of the testimony before the trial court, we review for plain error, R. 2:10-2, and conclude the testimony, itself, was not capable of producing an unjust result.  In the event of a retrial, however, law enforcement witnesses "can describe what appears on a recording but may not offer opinions about the content."  State v. Watson, 254 N.J. 558, 603 (2023).

alone to determine guilt, to prevent the court or the State from expressing an opinion of defendant's guilt, and to require the jury to determine under proper charges no matter how obvious guilt may be. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury.

[Frisby, 174 N.J. at 594 (2002) (quoting State v. Hightower, 120 N.J. 378, 427-28 (1990) (Handler, J., concurring in part and dissenting in part)).]

The risk that the detectives' statements might have led the jury to a verdict it would not otherwise have reached is compounded by the lack of a limiting instruction regarding how the jury should consider investigative techniques. "Our Supreme Court 'has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial.'" State v. C.W.H., 465 N.J. Super. 574, 595 (App. Div. 2021) (quoting State v. Vallejo, 198 N.J. 122, 135 (2009)). Here, the court provided no guidance on the detectives' lay opinions.

Moreover, Stabile testified police sometimes suggest a witness is lying to gather more information from him or her and repeatedly confront a witness if they think he or she is lying. This in-court testimony exacerbated the

problematic nature of the detectives' interrogation commentary by further suggesting defendant was lying during the interrogation.

In summary, although the disputed statements may be viewed as proper interrogation techniques, they are not proper statements for presentation to the jury in an unredacted statement. We therefore conclude the disputed statements were lay opinions interpreting the evidence, a function solely entrusted to the jury.

Defendant also maintains Stabile's comments such as, the fight video was viewed on social media by "a lot of people" who believed defendant "got knocked out," were inadmissible hearsay and, as such, the court erroneously denied his application to redact those references from his statement. We discern no reversible error.

Although testimony by a police officer conveying incriminating information from a non-testifying witness "violates both the hearsay rule and the defendant's confrontation right," State v. Medina, 242 N.J. 397, 412 (2020), Stabile's commentary was not offered for the truth of the matter asserted, that is, it was not proffered to prove defendant had been knocked out. Rather, the purpose of Stabile's statements was to establish defendant's motive, i.e., he was embarrassed by the wide distribution of the fight video. In any event, during his

29

statement, defendant acknowledged the fight was video recorded, people spoke with him about the video, and he knew police would wish to speak with him about it. Accordingly, even if Stabile's comments were hearsay, any error in their admission was harmless.

## 2. Invocation of the Right to Counsel

Before the trial court, defendant did not move to redact his invocation of his right to counsel from the interrogation video. He now argues the court's failure to redact his invocation, exacerbated by the prosecutor's summation remarks suggesting he was guilty because he "lawyer[ed] up," requires reversal of his convictions. At issue is the prosecutor's remark that even if defendant were "Mother Teresa," with all the evidence collected, the prosecutor would tell her, "Hey, Mother T, you need to lawyer up. You did something wrong, girl. There's no other explanation."

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "In the context of custodial interrogation, once a defendant

clearly and unambiguously invokes his right to remain silent, interrogation must cease." State v. Maltese, 222 N.J. 525, 545 (2015).

When a suspect waives his or her Miranda[7] rights, voluntarily speaks with police, then invokes the right to counsel later during questioning, "'trial courts should endeavor to excise any reference to a criminal defendant's invocation of his [or her] right to counsel' from the statement that the jury hears." State v. Clark, 251 N.J. 266, 292 (2022) (quoting State v. Feaster, 156 N.J. 1, 75-76 (1998)). In the alternative, "[w]hen 'testimony explaining why an interview or interrogation was terminated' is essential," the trial court should provide the jury a clear limiting instruction "emphasizing that a defendant's invocation of his right to counsel or right to remain silent may not in any way be used to infer guilt." Tung, 460 N.J. Super. at 94 (quoting Feaster, 156 N.J. at 76).

"New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters, observing that the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Smith, 212 N.J. 365, 402-03 (2012)). "[P]rosecutorial misconduct can be a ground for reversal where the prosecutor's

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

31

misconduct was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999).

"Even if the prosecutor exceeded the bounds of proper conduct, however, that finding does not end our inquiry." Williams, 471 N.J. Super. at 45. We will only reverse if the misconduct was "so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83. "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005). "Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made," and "deprives the court of the opportunity to take curative action." State v. Timmendequas, 161 N.J. 515, 576 (1999).

Because defendant neither sought to redact defendant's invocation of counsel before the trial court nor objected to its inclusion when the interrogation was played for the jury, we review for plain error. R. 2:10-2; see also Clark, 251 N.J. at 291; Tung, 460 N.J. Super. at 93-94. We similarly review the prosecutor's summation comments as defendant failed to object to the remarks at the time of trial. See State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2).

Based on our review of the record, we conclude there was no probative value to the inclusion of defendant's invocation of counsel, such as, to shed light on why his interrogation ended. Because defendant was largely silent during this exchange, there was no relevant reason to include this portion of the interrogation, which highlighted defendant's repeated invocation. Moreover, the prosecutor's improper remarks, although brief, clearly were out of bounds. The remarks implied the invocation of counsel suggested defendant's guilt.

Compounding this error, the court failed to provide a limiting instruction on the invocation. As we observed under similar circumstances in Tung:

> Given the longstanding standard of Feaster and the constitutional dimension of defendant's right to counsel, the trial court should have addressed this issue regardless of whether defense counsel objected. Standing alone, these references without a cautionary instruction might not constitute plain error. Combined with other errors, however, they had the clear capacity to undermine the verdict.
>
> [460 N.J. Super. at 95.]

Even if the failure to redact defendant's invocation of counsel and the prosecutor's comments in summation did not rise to plain error, those errors combined with the failure to redact the detectives' lay opinion were capable of producing an unjust result, warranting reversal of defendant's convictions.

33

Accordingly, if the matter is retried, those portions of the statement shall be redacted and the prosecutor shall refrain from such remarks.

## III.

In his second point, defendant argues the fight video was erroneously admitted over his objection because it was not properly authenticated and contained the superimposed comment, "WHOEVER BRO IS HE WAS KICKING ON THEM N****Z . . . ," immediately followed by an emoji shrugging and another crying with laughter. Defendant also argues Johnson's testimony about the video was grounded in inadmissible hearsay and speculation. He further contends the prosecutor misrepresented the video evidence in summation.

## A.

As noted above, on February 22, 2022, the motion court granted the State's application to admit evidence of "the physical altercation between [d]efendant and [the v]ictim" pursuant to N.J.R.E. 404(b). Prior to commencement of trial, defendant moved to preclude the State from admitting the fight video into evidence on authentication grounds. Citing a footnote of our decision in <u>Williams</u>, 471 N.J. Super. at 48 n.5, defendant claimed the State could not

authenticate the fight video "[b]ecause no State witness observed the altercation."

During oral argument on defendant's application, the prosecutor acknowledged the State would not call any witnesses who were present at the fight but countered the fight itself was "secondary" to the State's primary purpose. Through admission of the fight video, the State sought to demonstrate defendant was embarrassed by the fight video because it "went viral" on social media and defendant's embarrassment gave rise to his motive to kill Dunbar. The prosecutor further noted in his statement to police, defendant acknowledged the fight occurred and "[p]eople were talking about it."

At the conclusion of argument, the trial court denied defendant's application, subject to the State's proffer that the video would be authenticated by a witness who identified the setting and the individuals depicted in the video.

During the prosecutor's direct examination of Johnson at trial, defendant again objected to admission of the fight video on authentication grounds. Defense counsel argued Johnson was not present when the fight occurred, did not know defendant, and her knowledge that Dunbar participated in the fight was based on her hearsay statement that Dunbar told her so shortly after they met at work. The court overruled the objection finding Johnson could:

authenticate the video based on her acquired knowledge that Dunbar was depicted in the footage; identify the general location where the fight occurred; and confirm the video was the same video she saw on social media. The court reserved decision on defendant's objection to the text commentary on hearsay grounds. But the court noted, if after viewing the video the comments were prejudicial, it would strike the comment from evidence and instruct the jury accordingly.

Johnson testified the fight video shown in court was the same video she viewed on Facebook before Dunbar was killed. She identified the location of the fight depicted in the video as having occurred "[o]n Orient and Ocean in Jersey City." Johnson also identified Dunbar in a screenshot of the video and confirmed the screenshot "fairly and accurately show[ed] how . . . Dunbar looked in the video that [she] observed." Johnson explained she watched the video on Facebook because she viewed "a lot of videos of fighting" or "anything like entertaining, like everybody watches, so I watched the video as well." Following the prosecutor's leading questions, Johnson acknowledged "a lot of people" saw the fight video on Facebook and "a lot of comments [were] made . . . about this video." Johnson further claimed she had the same reaction about the fight as the person who posted the commentary.

Johnson also acknowledged she did not know Dunbar when she first viewed the fight video on Facebook; she later learned he was depicted in the video after he began working at the same company where she was employed. Johnson "overheard him telling the other employees about the fight that he just had." Johnson testified she told Dunbar she viewed the video on Facebook, they discussed the video, and Dunbar told her "how he got so many hit ups about that video."

In summation, the State argued defendant killed Dunbar because defendant "got made to look a fool. He was publicly embarrassed and so payback was execution." To support the State's motive theory, the prosecutor thereafter displayed screenshots from the fight video and repeatedly referenced the fight between Dunbar and defendant and Streets.

In its final charge to the jury, the court issued a proper instruction pursuant to N.J.R.E. 404(b), explaining the limited use of defendant's prior bad act, i.e., the fight between defendant and Dunbar. See Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016).[8]

---

[8] Although not challenged on appeal, the same limiting instruction also should have been issued when the prior bad act was admitted in evidence. Model Jury

B.

We employ a deferential standard of review of the trial court's decision on the admission of the fight video. <u>See</u> <u>Garcia</u>, 245 N.J. at 430. A mistaken exercise of discretion must be further reviewed for reversible error. <u>Gonzalez</u>, 249 N.J. at 633.

Our Supreme Court has long recognized "the authentication of a videotape is a direct offshoot of the authentication of photographic and motion picture evidence." <u>State v. Wilson</u>, 135 N.J. 4, 16 (1994); <u>see also</u> N.J.R.E. 1001(b) (considering videos and motion pictures equivalent to photographs). Videos therefore are admissible if properly authenticated under N.J.R.E. 901 (providing "the proponent must present evidence sufficient to support a finding that the item is what its proponent claims").

The proponent of video evidence must demonstrate "a prima facie showing of authenticity." <u>State v. Joseph</u>, 426 N.J. Super. 204, 220 (App. Div. 2012). "This burden was not designed to be onerous." <u>State v. Hockett</u>, 443 N.J. Super. 605, 613 (App. Div. 2016). "The authentication rule 'does not require absolute certainty or conclusive proof.'" <u>State v. Brown</u>, 463 N.J. Super.

---

Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))," at 1 n.1 (citing <u>State v. Williams</u>, 190 N.J. 114, 133-34 (2007); <u>State v. Angoy</u>, 329 N.J. Super. 79, 89 (App. Div. 2000)).

A-1940-22

33, 51-52 (App. Div. 2020) (quoting State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999)).

Authentication need not be established via the videographer. Wilson, 135 N.J. at 14. Rather, "any person with the requisite knowledge of the facts represented in the photograph or videotape may authenticate it." Ibid. Indeed, "[a]n authenticator need not even have been present at the time the photograph [or video] was taken, so long as the witness can verify that the photograph [or video] accurately represents its subject." Ibid.

The "witness must identify the persons, places, or things shown in the photograph or videotape." Ibid. As the Court explained in Wilson:

> To authenticate a photograph, testimony must establish that: (1) the photograph is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph.
>
> [Id. at 15.]

Analogously, we have applied "our traditional rules of authentication under N.J.R.E. 901" for social media posts. State v. Hannah, 448 N.J. Super. 78, 89 (App. Div. 2016).

A-1940-22

With these principles in view, we turn to defendant's challenges to Johnson's authentication of the fight video. Defendant maintains the State failed to present testimony from someone present at the fight scene "supposedly depicted in the video" or an individual versed in "the requisite technical knowledge" establishing the original video and copies "were what they purported to be." Defendant argues the record does not establish the genesis of the fight video or whether it was posted on a private or public social media account. Nor did Johnson testify "the video accurately depicted the events as they were seen while they occurred."

Resolution of the issue turns on the State's purpose in introducing the fight video. At trial, the State sought to admit the fight video for dual purposes – both as proof of the fight itself, and to demonstrate the fight video was posted on social media, widely viewed, and therefore caused defendant embarrassment, establishing motive.

To the extent the State introduced the video as evidence of the fight between defendant and Dunbar, we agree with defendant that Johnson's testimony fell short of proper authentication. Johnson had no firsthand knowledge that the fight video was "an accurate reproduction" of the fight itself. See Wilson, 135 N.J. at 15. She did not witness the fight and, as such, lacked

the "requisite knowledge of the facts represented in the [fight video]." See id. at 14. Instead, Johnson testified she determined Dunbar was depicted in the video following her conversation with him about the fight. A witness's authentication cannot be based on hearsay. See id. at 19. We therefore conclude the court erred in admitting the video as proof of the fight itself.

Nonetheless, because the physical altercation between defendant and Dunbar was not disputed, admission of the fight video as proof of their altercation did not rise to reversible error. Indeed, during his statement to police, defendant readily acknowledged the existence of the fight. Under those circumstances, the error was not "clearly capable of producing an unjust result." R. 2:10-2. Accordingly, we find no merit in defendant's contention that the prosecutor improperly commented on the fight video in summation.

Further, we discern no error in Johnson's authentication of the fight video, including the commentary, as an accurate representation of the video she viewed on Facebook. Johnson properly testified the video presented to the jury was the same video she viewed on Facebook. Johnson also recalled observing the commentary captioned on the video, testifying it reflected her similar reaction to the fight. See United States v. Needham, 852 F.3d 830, 836 (8th Cir. 2017) ("Exhibits depicting online content may be authenticated by a person's testimony

41

that he is familiar with the online content and that the exhibits are in the same format as the online content.").

Nor are we persuaded Johnson's testimony about the social media reach of the video was impermissibly speculative. Although the prosecutor posed leading questions, Johnson acknowledged many people watched the video and commented about it. We agree, however, that Johnson improperly relayed Dunbar's statement that "he got so many hit ups about that video." Dunbar's statement was inadmissible hearsay, offered for the truth that the video was widely circulated and commented upon. Because defendant acknowledged in his police interview that many people had viewed the video and approached him about it, we conclude any error was harmless.

If the matter is retried on remand, the court should consider the State's purpose for offering the video. If the State again proffers the video fairly and accurately depicts the fight between defendant and Dunbar, the trial court "must" issue a limiting instruction both when the evidence is introduced and, as it did here, as part of its final instructions to the jury pursuant to Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))." If the State only proffers the video as an accurate representation of the social media video viewed by Johnson or any other witness, the court should issue a limiting

and final instruction directing the jury to consider the video, not as evidence of the fight itself, but to determine whether the video supports the purported motive assigned to defendant.

## IV.

In point IV, defendant asserts various overlapping errors by the State and the trial court deprived him of his rights to a fair trial and due process: (A) the prosecutor's summation analogy diluted the State's burden of proof, particularly in view of the court's failure to issue an identification charge pursuant to Model Jury Charges (Criminal), "Identification: No In- Or Out-Of-Court Identification" (approved Oct. 26, 2015); (B) the prosecutor implied its expert witness was credible because he was not paid; and (C) the prosecutor's self-created use of charts was misleading and the court erroneously "admitted the charts into evidence through lay witnesses that did not prepare the[] charts." The claims raised in subpoints IV(A) and (B) were not raised before the trial court. We are not persuaded any of the purported errors, singularly or cumulatively, denied defendant a fair trial or due process.

## A.

Defendant belatedly argues the State misrepresented the reasonable doubt standard when, during closing arguments, the prosecutor suggested the jury need

not determine the "<u>why</u> someone is guilty beyond a reasonable doubt, but just needs to feel that it is true." He claims this error was compounded by the court's failure to issue the applicable identification instruction.

### 1. The Prosecutor's Remarks

In his closing remarks, the prosecutor endeavored to explain reasonable doubt cannot be quantified and, unlike a popular television detective show, there were no "ballistics and the identifications." The prosecutor then gave three "quick[] . . . hypothetical[s]":

> So, I can see it snow [sic]. It snowed. In no world am I wondering oh, did my neighbor from up the street just get twelve dump trucks and bring in snow over the night and asking, oh, did someone, you know, get a snowmaker? No. You're not asking that. You're like oh, snow's outside. Cool. Let's go sledding, right. That's how we work. Think about it.

> The next one, tree in the woods, does it make a sound? Yep. Do we have any evidence of it? Nope. But we know it, right. Gravity, we know it.

> And the last one is my favorite. Dinosaurs, guys. Sixty-five million years ago, right. We not only know that they lived. We know how they died. We know which ones eat what. How do we know that? I don't know, but the point is don't confuse yourself into thinking that there's some sort of statistical level or threshold that makes you ignore what is painfully obvious.

While inartful, the prosecutor's remarks were no more than an attempt to explain circumstantial evidence to the jury.  In fact, the snow hypothetical was loosely based on the snow illustration contained in the model jury charge issued during the court's opening instructions.  See Model Jury Charges (Criminal), "Instructions After Jury Is Sworn" (rev. Sept. 1, 2022).  Although it would have been preferable if the prosecutor tethered his remarks to the circumstantial evidence charge issued by the court in its final instructions, any prejudice resulting from those comments was sufficiently mitigated by the trial court's thorough instruction on reasonable doubt, direct and circumstantial evidence, and that counsels' arguments or comments are not evidence.  Those instructions tracked the model jury charge nearly verbatim.  See Model Jury Charges (Criminal), "Reasonable Doubt" (rev. Feb. 24, 1997).  "We must assume the jury followed the court's instruction."  State v. Little, 296 N.J. Super. 573, 580 (App. Div. 1997).  We conclude the prosecutor's remarks were not sufficiently egregious to deprive defendant of a fair trial.  Frost, 158 N.J. at 83.

## 2.  The Identification Charge

Defendant's theory was that the State did not prove he was the shooter and a third-party committed the crime.  Accordingly, as part of its final instructions to the jury, the court prudently issued a third-party guilt charge that tracked the

model jury charge. See Model Jury Charges (Criminal), "Third[-]Party Guilt Jury Charge" (approved Mar. 9, 2015). For the first time on appeal, defendant argues the court sua sponte should have issued an identification charge reflecting the State's burden to prove the identity of the shooter. See Model Jury Charges (Criminal), "Identification: No In- Or Out-Of-Court Identification," at 1. Defendant now argues the failure to issue this instruction constituted reversible error in view of the prosecutor's comments, thereby diluting the State's burden.

The charge applies because defendant maintained he was not the shooter and the State sought to prove his guilt without an eyewitness identification or any other direct evidence that he committed the murder. The State's case was based on the theory that surveillance video depicted the movements of defendant's Trailblazer around the area of the murder and his cell phone records established his whereabouts at that time. Because the State relied on circumstantial evidence to prove the charges against defendant, the charge should have been issued. Id. at 1 n.1. Although we are not convinced the failure to issue the charge rose to plain error, because we are reversing on other grounds, on retrial, the court should issue the no in- or out-of-court identification charge even if not requested.

A-1940-22

B.

Little need be said regarding defendant's newly minted claim that the prosecutor impermissibly bolstered the credibility of one of the State's expert witnesses by stating he was not paid for his testimony.  Defendant now complains about the following remarks regarding FBI Special Agent John Hauger's testimony:

> Yeah, the FBI guy who probably couldn't be more annoyed with me asking for three different versions of something.  You think he works for me?  No.  We don't pay him.
>
> You think he's being untruthful?  You think he's coming in here and saying, yes, this prosecutor who I don't know (indiscernible) and this defendant who I don't know, I have so little integrity that, tell me what you want me to say and we'll do it or how about (indiscernible) and we'll say it.  Is that how these things work?  No.

The prosecutor's comments followed defense counsel's summation remark that the State had presented the testimony of several witnesses but "only . . . two of them were not paid by the State."  The prosecutor neither expressed a personal belief or opinion as to the truthfulness of Haugher's testimony, see State v. Staples, 263 N.J. Super. 602, 605 (App. Div. 1993), nor attempted to vouch for his credibility, see State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004). Rather, viewed in context, the comments were made in response to defendant's

argument. See State v. Marshall, 123 N.J. 1, 156 (1991) (finding it proper for a prosecutor to argue that a witness's testimony is credible, but improper to offer an opinion on the witness's credibility).

Given the context and fleeting nature of the remarks, we discern no error, let alone plain error, in the prosecutor's comments. See State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993) ("Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless.").

C.

Lastly, we consider defendant's renewed challenges to the prosecutor's creation and use of charts and graphs summarizing cell phone data, which were introduced into evidence by three lay witnesses. As he did before the trial court, defendant claims the exhibits were erroneously admitted into evidence as demonstrative aids because they were "summaries" under N.J.R.E. 1006, requiring data analysis by an expert and, as such, the defense was deprived the opportunity to retain an expert to verify their accuracy. Although defendant couches his argument in terms of prosecutorial misconduct, he essentially claims the trial court erroneously admitted the summary charts.

The State presented the cell phone evidence through three lay witnesses: an HCPO detective assigned to the Technical Services Unit, who extracted data

from defendant's cell phone; Porter, who testified about the quantity of phone calls that connected from defendant's cell phones to certain cell towers relevant to the investigation; and a T-Mobile employee, who testified about the records retrieved from defendant's phones, and calculated the average number of calls and messages he sent and received per day and hour.

The State also called Hauger as an expert in cellular analysis. Hauger testified about his own chart summarizing defendant's cell phone data. The State did not seek to introduce any of the prosecutor's charts through Hauger's testimony.

Following lengthy sidebar arguments, the court admitted the summaries into evidence finding they were demonstrative aids that would assist the jury by summarizing documents previously moved into evidence thereby saving time. Pursuant to the court's directive, however, the prosecutor reviewed the calculations underlying his summary with the witnesses to ensure their accuracy.

N.J.R.E. 1006 permits the use of summaries. Three categories of evidentiary summaries may be presented in court: (1) "'primary-evidence summaries' . . . to condense voluminous materials that cannot be conveniently examined in court," (2) "'pedagogical-device summaries' . . . to summarize, clarify or simplify proofs admitted in the case"; and (3) "'secondary-evidence

49

summaries'[, which] . . . are hybrids of the first two categories, admitted 'not in lieu of the evidence they summarize but in addition thereto.'" Heinzerling v. Goldfarb, 359 N.J. Super. 1, 8 (Law Div. 2002) (quoting United States v. Bray, 139 F.3d 1104, 1112 (6th Cir. 1998)).

A summary "must fairly condense the underlying material[,]" and it "cannot embellish with information not contained in the originals," id. at 11-12 (quoting C. Mueller & L. Kirkpatrick, Evidence § 10.16 at 1236). Summaries admitted under N.J.R.E. 1006 must be "substantially balanced and fair." Id. at 15. Demonstrative evidence must be authenticated, N.J.R.E. 901, and relevant, N.J.R.E. 401, and its probative value must not be offset by undue prejudice, unfair surprise, undue consumption of trial time, or possible confusion of issues due to the introduction of collateral matters, N.J.R.E. 403. However, "[t]here is nothing inherently improper in the use of demonstrative or illustrative evidence." State v. Scherzer, 301 N.J. Super. 363, 434 (App. Div. 1997); see also Feaster, 156 N.J. at 82.

Generally, a "trial court enjoys wide latitude in admitting or rejecting such replicas, illustrations and demonstrations and in controlling the manner of presentation and whether or not particular items are merely exhibited in court or actually received in evidence." Rodd v. Raritan Radiologic Assocs., P.A., 373

N.J. Super. 154, 165 (App. Div. 2004); see also Scherzer, 301 N.J. Super. at 434;

Feaster, 156 N.J. at 82. That is because the court controls not only the admission

of this type of evidence, but also the form and limits of its presentation. See

Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E.

611 (2024-2025). Absent an abuse of discretion, we will not reverse a trial

court's decision on the admission of demonstrative evidence. See Feaster, 156

N.J. at 82; Rodd, 373 N.J. Super. at 165.

Based on our review of the record provided on appeal, we cannot conclude

the trial court abused its discretion in admitting the summaries into evidence.

The court found the exhibits served to highlight certain portions of the record

and summarized extensive data relative to defendant's cell phone records. We

recognize, as did the trial court, because the prosecutor prepared the charts and

based on his mathematical calculations, each witness's testimony served as a

means to introduce the prosecutor's analysis. Because the court ultimately

required the prosecutor to review the calculations with the witnesses on the

record, however, the witnesses adopted the calculations and analyses as their

own. Accordingly, the charts and graphs served as appropriate demonstrative

aids under N.J.R.E. 1006, summarizing and simplifying the proofs presented in

the case. See Heinzerling, 359 N.J. Super. at 8. Because we afford a trial court

"wide latitude" in its decisions on the use of such demonstrative aids, we discern no error in the court's decision.  <u>See</u> <u>Rodd</u>, 373 N.J. Super. at 165.

Affirmed in part, reversed and remanded in part.  Jurisdiction is not retained.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1940-22