# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4023-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

V.L.M. (deceased),

     Defendant,

and

G.M.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.LM.
and M.M.M., minors.

_____

     Submitted June 3, 2026 – Decided June 26, 2026

     Before Judges Rose and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0011-25.

Jennifer N. Sellitti, Public Defender, attorney for appellant (James D. O'Kelly, Designated Counsel, on the brief).

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors M.L.M. and M.M.M. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant G.M. appeals from a July 29, 2025 Family Part judgment terminating his parental rights to his biological daughters, M.L.M. (Mary), born in 2010, and M.M.M. (Michelle), born in 2021.[1] The children's mother, defendant V.L.M. (Violet), is deceased; defendant is accused of her shooting death – the precipitating event that led to the guardianship complaint. At the time of the homicide, the family home was comprised of defendant, Violet, their

---

[1] Consistent with the parties' briefs, we use initials to protect the confidentiality of these proceedings, R. 1:38-3(d)(12), and pseudonyms for ease of reference. Defendant is the biological father of another child, A.M., born in 2017, who is not a party to this appeal.

daughters, Mary and Michelle, and Violet's three other biological children, L.E., born 2012, Y.E., born 2013, and N.E., born 2017.[2]

On appeal, defendant argues the trial court's erroneous evidentiary rulings, burden shifting, and bias warrant reversal and remand for a new trial before another judge. The children's law guardian supported termination before the trial court, and again on appeal, joins the Division of Child Protection and Permanency, urging us to affirm. Based on our review of the trial record and prevailing legal standards, we are satisfied the evidence in favor of the guardianship petition overwhelmingly supports the court's decision terminating defendant's parental rights, see N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007), and there is no merit to the claims defendant raises on appeal. Accordingly, we affirm.

I.

During the three-day guardianship trial, the Division presented the testimony of: a family service specialist assigned to the Division's adoption unit, who testified about the services offered to defendant and the children; Officer Jay O'Campo of the Elizabeth Police Department, who responded to the

---

[2] Following Violet's death, L.E., Y.E., and N.E. were removed from the family home, placed with their biological father W.E., and are not parties to this appeal.

homicide scene; the children's maternal great grandmother, B.R. (Beth), who wishes to adopt the children; and psychology expert, Alison Winston, Ph.D., who testified about her evaluations of the children. All four witnesses were deemed credible by the trial court. Over defense counsel's authentication and hearsay objections, the court admitted into evidence Mary's video-recorded statement to police. Defendant absented himself from trial. Neither he nor the law guardian presented any evidence.

The testimony adduced at trial is summarized in the trial court's comprehensive written decision accompanying the July 29, 2025 judgment. We highlight the facts and events pertinent to this appeal.

On November 23, 2023, police responded to a call of shots fired at the family residence. O'Campo testified, upon arrival, he observed Violet on the floor, having succumbed to gunshot wounds to her head and chest. O'Campo observed "an entry [wound] to the head and to the chest; it was two shots." O'Campo found the children in a neighbor's home and transported them to the hospital.

That same day, Mary, then thirteen years old, gave a recorded statement to members of the Union County Prosecutor's Office (UCPO). In her statement, Mary said she was in her room when she heard Violet refuse defendant's

demands for money, followed by "one bang," Violet's screaming, and a second bang, after which it got quiet.  Defendant then told the children to go to their neighbor's home.  In her statement, Mary described a "good relationship with [her] mom," but said "[she] didn't really like [her] dad."  She claimed her parents argued more as she got older.

Defendant was charged with murder and related offenses, and detained pretrial.  We glean from the record, in the criminal matter, defendant was ordered to have no contact with his daughters.  At the time of the guardianship trial, defendant's criminal case was not resolved.[3]

The Division worker testified the Division typically visits incarcerated parents twice per month, but – at his request – visited defendant only once a month.  The Division recommended defendant undergo a psychological evaluation, but defendant objected, and the court denied the Division's application to compel the evaluation in view of defendant's pending criminal charges.  The worker testified defendant not only "want[ed] the children to remain with [Beth]," but also "didn't need any other family members assessed."

---

[3]  As of the filing of his March 18, 2026 merits brief, defendant's criminal case was still pending.  Pursuant to an inquiry by the Appellate Division's Clerk's Office, defendant's criminal matter remains pending.

When confronted with the choice of surrendering his parental rights, defendant "indicated he'[d] just let the court take his rights."[4]

Dr. Winston conducted psychological evaluations of Mary in April 2024, and April 2025. She also conducted a bonding evaluation of Mary and Michelle with Beth in April 2025.

Dr. Winston testified, during her 2024 evaluation, when questioned about Violet's death, Mary initially "paused," "looked down," and "couldn't talk about it." Eventually, Mary disclosed "she had heard two gunshots and then [defendant] came into the room and told them that they had to leave, and he was blocking them so that they couldn't see her mother." Mary "tried to look but she couldn't see her [mother's] body as they were walking through the living room." Mary told Dr. Winston defendant brought the children to their neighbor's home. Mary said "she did not want to see [defendant]" and "was glad that she hadn't seen him since November." When Dr. Winston asked what Mary would say to defendant if she saw him, Mary stated, "I'd say why did you do that?"

Dr. Winston testified she diagnosed Mary with post-traumatic stress disorder (PTSD), explaining Mary exhibited symptoms, such as hypervigilance,

---

[4] Similarly, in the Title Nine action, defendant voluntarily waived his right to challenge the Division's substantiated findings at a fact-finding trial.

A-4023-24

intrusive thoughts, occasional nightmares, and avoidance, which "[we]re all consistent with PTSD." Dr. Winston also diagnosed Mary with "child physical abuse," "child psychological abuse," and "child neglect," based largely on Mary's history and statements.

Dr. Winston testified, during her 2025 evaluation, Mary explained she did not want defendant to have her photograph because "she doesn't want anything to do with him." Mary expressed her desire to have defendant's parental rights terminated and for Beth to adopt her. Dr. Winston found Mary continued to experience symptoms of trauma from Violet's death. Dr. Winston opined removing the children from Beth would be "very traumatic."

Conversely, terminating defendant's rights would give Mary "a sense of relief." Dr. Winston explained:

> M[ary] was very consistent throughout both evaluations that she wanted nothing to do with her father; she never wanted to see him again. She wanted him to be incarcerated for life. She disclosed a lot of physical and emotional abuse by her father to her. She disclosed that there had been domestic violence perpetrated by her father against her mother.

Dr. Winston further opined terminating defendant's rights would have "minimal, if any impact" on Michelle in view of her age. Dr. Winson explained, "Any bond that M[ichelle] had with her father was a trauma-based bond [as] she

7

was in a home with him for seventeen months where there was domestic violence, alcohol abuse," and "no security."

Beth testified the children were "doing great" in her care. Having adopted other children, Beth was familiar with the difference between adoption and kinship legal guardianship. She was steadfast in her desire to adopt the girls.

Following closing arguments, the trial judge reserved decision and thereafter issued a thorough written opinion, finding the Division established, by clear and convincing evidence, all four prongs of the best interests standard under N.J.S.A. 30:4C-15.1(a)(1) to (4). Accordingly, Mary and Michelle were freed for adoption by Beth, with whom the girls have resided since their mother's death. This appeal followed.

II.

We are guided by well-established principles. Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). We will uphold the court's factual findings if they are "supported by adequate, substantial, and credible evidence." Ibid. "Concomitantly, reviewing courts should defer to the trial court's credibility determinations." Ibid. We do so because the court "has the opportunity to make first-hand credibility judgments about the witnesses who

appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293). Our Supreme Court has reiterated "a trial court's factual findings" in a guardianship action "'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). However, we review de novo the trial court's legal interpretations. See R.G., 217 N.J. at 552-53.

In its decision, the trial court made factual and credibility findings in view of the evidence adduced at trial, and cogently analyzed the evidence in view of the statutory "best interests of the child" test:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1) to (4).]

As the court recognized, the four prongs "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

## A. Admissibility of Mary's Statements

Defendant first argues the guardianship judgment must be reversed because the trial court committed multiple evidentiary errors, undermining its prong one finding. In his overlapping arguments, defendant contends the court erroneously: admitted Mary's statement to police, without the requisite corroboration and authentication; found Mary's statements were admissible under N.J.S.A. 9:6-8.46(a)(4), and Rule 5:12-4(d); and relied on Mary's statements to Dr. Winston about domestic violence in the family home.

"Appellate courts review evidentiary determinations by a trial court, including hearsay determinations, for abuse of discretion." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017). The danger of hearsay,

moreover, is mitigated in a bench trial.  See N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016).

1. Corroboration

We recognize, as defendant argues, the trial court erroneously cited N.J.S.A. 9:6-8.45(a)(4) as a basis for admitting Mary's out-of-court statements at trial.  We have held admission of hearsay statements of children under that statute is limited to Title Nine actions.  N.J. Div. of Child Prot. & Permanency v. T.U.B., 450 N.J. Super. 210, 214 (App. Div. 2017).  In response to our decision in T.U.B., however, the Legislature enacted N.J.S.A. 30:4C-15.1a.  See S. Health, Hum. Servs. and Senior Citizens Comm. Statement to S.B. 497 (Mar. 12, 2018).

N.J.S.A. 30:4C-15.1a provides, in pertinent part:

> a.  Previous statements made by a child relating to any allegations of abuse or neglect of that child shall be admissible in evidence in any hearing:  to terminate parental rights . . . .
>
> b.  No such statement, if uncorroborated, shall be sufficient to make a determination that termination of parental rights is in the best interests of the child, or to make a fact finding of abuse or neglect.

Applying similar provisions set forth in N.J.S.A. 9:6-8.46, we have concluded corroboration requires "[s]ome direct or circumstantial evidence

beyond the child's statement itself." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017). The corroborative evidence need not exactly mirror the child's allegations of abuse. See N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003). Instead, "corroborative evidence 'need only provide support for the out-of-court statements.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)). We review de novo a trial court's corroboration determination. N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018).

The trial court found Mary's statements "[were] sufficiently corroborated in this matter thereby proving them to be reliable." The court elaborated:

> M[ary]'s statements were consistent in terms of what she observed and experienced on the night of November 23, 2023 and what she experienced and observed in the home prior to this incident. As such, her statements are worthy of consideration by this [c]ourt because they have been sufficiently corroborated through competent evidence produced at the time of trial including testimony by Officer O['C]ampo, the Division's reports, and the unchallenged expert witness evaluation of Dr. Winston.

Defendant claims "the trial court's summary conclusion" evades "meaningful appellate review." See R. 1:7-4(a). But elsewhere in its decision,

the court expressly stated the evidence that satisfied the corroboration requirement under N.J.S.A. 30:4C-15.1a.

For example, in its decision, the court cited O'Campo's observations upon his arrival at the family home. Those observations included two lethal gunshot wounds to Violet's body, which were consistent with Mary's statement to police, "we heard one bang, and my mom . . . screaming" and "she said, 'no, don't do this,' and that's when we heard another one." The court found "no contradictions in [O'Campo's] testimony and he was believable."

Further, in its decision, the court also referenced Dr. Winston's diagnoses of Mary, which included "[PTSD], child physical abuse, subsequent encounter, child neglect, confirmed, subsequent encounter, and child psychological abuse, confirmed, subsequent encounter." The court deemed Dr. Winston "a highly credible witness."

Based on our de novo review of the record, we are satisfied the court's findings are "supported by adequate, substantial, and credible evidence" in the record. See R.G., 217 N.J. at 552. We therefore conclude O'Campo's observations and Dr. Winston's diagnoses were plainly sufficient to satisfy the corroboration requirement of N.J.S.A. 30:4C-15.1a.

A-4023-24

Defendant's remaining contentions regarding the lack of corroboration of Mary's statements lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

## 2.  Authentication

At trial, the Division did not present the testimony of the detectives who conducted Mary's interview.  Instead, the Division introduced into evidence the detectives' certifications, both of which stated:  "The attached video and transcript of the interviews conducted with [Mary and L.E.] on Thursday, November 23, 2023, at the [UCPO] accurately depict the events that took place therein."  Both detectives further certified the "interviews were completed [and maintained] in the regular course of business of [the UCPO]."

During trial, defense counsel objected to the Division's application to admit into evidence the detectives' certifications in lieu of testimony.  Counsel's contention was part of his broader argument that Mary's video-recorded statement was cumulative as it was "summarized in many of the [Division's] screening summaries."[5]  The following trial day, during his closing argument,

---

[5] Defendant further argued L.E.'s recorded statement was inadmissible because she was a non-party.  Following an opportunity to brief the issue, the Division withdrew its request to admit into evidence L.E.'s statement.

defense counsel acknowledged he did not contend the video-recording was incomplete or altered.

We employ a deferential standard of review of a judge's decision on the admission of a video recording. See State v. Garcia, 245 N.J. 412, 430 (2021). A mistaken exercise of discretion must be further reviewed for reversible error. State v. Gonzalez, 249 N.J. 612, 633 (2022).

Our Supreme Court has long recognized "the authentication of a videotape is a direct offshoot of the authentication of photographic and motion picture evidence." State v. Wilson, 135 N.J. 4, 16 (1994); see also N.J.R.E. 1001(b) (considering videos and motion pictures equivalent to photographs). Videos therefore are admissible if properly authenticated under N.J.R.E. 901 (providing "the proponent must present evidence sufficient to support a finding that the item is what its proponent claims").

The proponent of video evidence must demonstrate "a prima facie showing of authenticity." State v. Joseph, 426 N.J. Super. 204, 220 (App. Div. 2012) (quoting State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999)). "This burden was not designed to be onerous." State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016). "The authentication rule 'does not require absolute

certainty or conclusive proof.'" State v. Brown, 463 N.J. Super. 33, 51-52 (App. Div. 2020) (quoting Mays, 321 N.J. Super. at 628).

The "witness must identify the persons, places, or things shown in the photograph or videotape." Wilson, 135 N.J. at 14. As the Court explained in Wilson:

> To authenticate a photograph [or video recording], testimony must establish that: (1) the photograph [or video recording] is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph [or video recording].
>
> [Id. at 15.]

With these principles in view, we discern no error in the trial court's reliance on the detectives' certifications to authenticate their video-recorded interview of Mary. Neither certification contained hearsay statements; both certifications established "the item is what its proponent claims." N.J.R.E. 901. Defendant proffered no evidence to the contrary. Moreover, as the Division argues in its responding brief, the detectives' certifications established the videos were made and maintained in the regular course of the UCPO's business. See N.J.R.E. 803(c)(6).

A-4023-24

## B. Burden Shifting and Adverse Inference

Defendant next argues the trial court improperly considered his failure to appear at trial. Although defendant contends the judge "did not explain specifically how the adverse inference applied to its application of the evidence to the four prongs" of the best interests test, defendant asserts the court effectively shifted the burden of proof and denied his right to a fair hearing. Citing our decisions in New Jersey Division of Youth & Family Services v. M.G., 427 N.J. Super. 154, 169 (App. Div. 2012), and New Jersey Division of Youth & Family Services v. P.W.R., 410 N.J. Super. 501, 506 (App. Div. 2009), rev'd on other grounds, 205 N.J. 17 (2011), defendant claims parents are not required to attend the guardianship trial if they are represented by counsel.

In its decision, the trial court expressly stated it did not consider defendant's decision not to testify at trial for two reasons: "he is not required to testify"; and "it would be a violation of [his] right against self-incrimination" under the Fifth Amendment and N.J.R.E. 503. However, the court explained "[it] considered as one part of a greater TPR[6] analysis [defendant]'s abject refusal to leave the Essex County Jail and appear for trial without a reasonable excuse." The court noted "[it] issued multiple orders requiring [defendant]'s

---

[6] Termination of parental rights.

presence for each day of the trial, ensuring he had a substantial opportunity to engage and support his legal counsel, who performed exceptionally well despite [defendant]'s intentional absence from these proceedings." The court considered defendant's willful absence from trial as part of its "reasonable efforts" prong three analysis, N.J.S.A. 30:4C-15.1(a)(3).

We have reiterated, in the context of the entry of default judgment against a parent who failed to appear at the guardianship trial, "[b]ecause a party represented by counsel may defend at trial without being physically present, default may not be entered when a party is not present at a trial absent evidence that the party has not otherwise defended as required by rule or court order." M.G., 427 N.J. Super. at 169 (quoting P.W.R., 410 N.J. Super. at 506). However, the parties have not cited, and our independent research has not revealed, any binding authority prohibiting a Family Court judge from commenting on a parent's willful absence from trial vis-à-vis the judge's analysis of the best interests test.

Even assuming the court's comments about defendant's absence from trial were out of bounds, the remarks were but "one part" of its best interests analysis under N.J.S.A. 30:4C-15.1(a). Based on our review of the record, the court's ultimate decision was rendered on its fulsome review of the overwhelming

evidence adduced at trial, including Mary's account of her mother's death and Dr. Winston's unchallenged expert opinion. Accordingly, any error was harmless. See R. 2:10-2 (directing reviewing courts to disregard "[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result").

## C. Bias

Lastly, defendant argues the court's "derisive" remarks and "incessant interruption of defense counsel's summation" "showed bias and undermine[d] confidence in the judiciary and the reliability of the termination decision." In particular, defendant asserts the court improperly: "called [him] a coward"; "claimed [he] was 'too afraid to face the consequence of the truth'"; "play[ed] 'TPR chicken'"; and "ma[de] 'woe is me' complaints."

It is beyond peradventure that "judges are required to maintain, enforce, and observe 'high standards of conduct so that the integrity and independence of the judiciary may be preserved.'" State v. McCabe, 201 N.J. 34, 43 (2010) (quoting Code of Jud. Conduct, canon 1). We have recognized, however, "inappropriate comments do not, by themselves, necessarily equate to bias." Panitch v. Panitch, 339 N.J. Super. 63, 68 (App. Div. 2001). Further, "we must determine whether, in the aggregate, 'the actions of the trial judge deprived the

19

defendant of a fair trial.'" Hitchman v. Nagy, 382 N.J. Super. 433, 452 (App. Div. 2006) (quoting Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 299 (App. Div. 1999)); see also State v. Medina, 349 N.J. Super. 108, 132 (App. Div. 2002) (holding "isolated instances of judicial annoyance or impatience do not warrant the drastic remedy of vitiating an otherwise valid conviction").

Here, although the trial court's comments were inappropriate, when measured against the entirety of the court's thirty-four-page written decision, we conclude they did not deprive defendant of his right to a fair trial. Similarly, although the court's involvement in defense counsel's closing argument might have become, at times, distracting when viewed in the context of the summation as a whole, we are satisfied the court afforded defense counsel a full opportunity to present his closing remarks. Moreover, the court likewise interrupted the closing remarks of the deputy attorney general and law guardian. On this record, we have no reason to doubt the court's good faith and impartiality.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-4023-24